## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**JEFF TITUS,**
    *Petitioner*,

                                  Case No.: 2:18-CV-11315

v.                                 Hon. Paul D. Borman

**BRYAN MORRISON, Warden**
    *Respondent.*

## SUPPLEMENTAL MOTION TO AMEND AND GRANT PETITION
## FOR WRIT OF HABEAS CORPUS

**MICHIGAN INNOCENCE CLINIC**
University of Michigan Law School
David A. Moran (P45353)
Imran J. Syed (P75415)
Elizabeth Cole (PA Bar No. 327003)
Alexis Franks (Student Attorney)
Naomi Farahan (Student Attorney)
Olivia Daniels (Student Attorney)
**ATTORNEYS FOR PETITIONER**
701 S. State Street
Ann Arbor, MI 48109
(734) 763-9353

# TABLE OF CONTENTS

CONTROLLING AUTHORITY ................................................................. iii

INTRODUCTION ................................................................... 1

FACTUAL SUMMARY ...................................................... 2

    I.     Crime and Investigation ...................................................... 2
    II.    Trial and Conviction .......................................................... 3
    III.   Procedural History .............................................................. 4

ARGUMENT ........................................................................... 4

    I.     Mr. Titus Is Entitled To a Writ of Habeas Corpus Because *Brady* Was Violated When Investigators Failed To Disclose Evidence of an Alternative Suspect ................................................................... 4

CONCLUSION AND RELIEF REQUESTED ..................................... 11

## APPENDICES

Appendix A- Wiersema-Ballet Report
Appendix B- Wiersema Affidavit
Appendix C- KCSD Condensed Docs.
Appendix D- Coshocton Co. Report
Appendix E- FBI Lineup Report
Appendix F- KPCO FOIA
Appendix G- Podcast Ep. 11
Appendix H- FBI Chappell Notes
Appendix I- Documentary Pt. II Tr.
Appendix J- CCCAT News Release 05/30/00
Appendix K- Dillon Comparison
Appendix L- Gray Chevy Cavalier
Appendix M- Trombitas FBI Report
Appendix N- Incident Report
Appendix O- Nofz Affidavit
Appendix P- Chappell Affidavit
Appendix Q- Titus Affidavit
Appendix R- Estes v. Titus Trial Transcript (Excerpt)

# CONTROLLING AUTHORITY

## <u>Cases</u>

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................ 1, 4, 9, 10

*Kyles v. Whitley*, 514 U.S. 419 (1995)........................................................................ 10

## <u>Statutes</u>

MCL 750.227B-A ……………………………………………………………………...4

MCL 750.316(1)(a)……………………………………………………………….......3

## <u>SUPPLEMENTAL MOTION TO AMEND AND GRANT HABEAS PETITION</u>

Petitioner Jeff Titus, by his attorneys and student attorneys of the Michigan Innocence Clinic at the University of Michigan Law School, asks this Court to accept this amendment to, and grant the currently-pending habeas petition unconditionally so that Mr. Titus may be released from custody forthwith.

## INTRODUCTION

On July 19, 2002, Jeff Titus was convicted of first-degree murder for the November 17, 1990, shootings of Doug Estes and Jim Bennett at the Fulton State Game Area in Kalamazoo County, Michigan. There was no physical evidence tying Mr. Titus to the scene, so the State's case focused on character evidence and the testimony of one witness, Bonnie Huffman, who claimed that she saw Mr. Titus near the game area not long after the shootings. Mr. Titus has always maintained that he was hunting with a friend on private land some 27 miles away and that he did not return to his home near the game area until hours after the killings.

However, the conviction has been significantly undermined in light of the discovery of previously undisclosed evidence that was not turned over to the defense before trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In the original investigation in the early 1990s, police uncovered evidence that implicated a confessed serial killer, Thomas Dillon, as the likely true murderer. When the case was reopened a decade later by a cold case team, that team was apparently unaware

1

of this evidence, and therefore did not notify the prosecutor or the defense of the evidence implicating Dillon. The Dillon file, bolstered even further by a recent recantation from Bonnie Huffman, the only witness who placed Mr. Titus near the scene of the crime, provides evidence of Mr. Titus' innocence. For these reasons, habeas relief should be granted and Mr. Titus should be released.

## FACTUAL SUMMARY

### I.      Crime and Investigation

On the afternoon of November 17, 1990, Doug Estes and Jim Bennett were shot at close range and killed while hunting in the Fulton State Game Area in Fulton, Michigan. CCCAT News Release 05/30/00, Appendix J. On the same day, Mr. Titus was hunting with his friend, Stanley Driskell, near Battle Creek—some 27 miles away from the Fulton Game Area. Trial Tr. 07/16/02 at 886. Mr. Titus and Mr. Driskell ended their day of hunting at around 6:00 p.m. and drove the approximately 40 minutes back to Mr. Titus' home. Civil Trial Tr. 05/26/2004 at 163-64, Appendix R.

Upon returning home after dark, the two men noticed police had cordoned off the back of Mr. Titus' property. Trial Tr. 07/16/02 at 896. Mr. Titus spoke with the investigating officers and offered access to his land for emergency vehicles. Incident Report at 5, Appendix N. He then went to the home of his neighbor, Patricia Burnworth, where he spoke with her and her daughter, Bonnie Huffman, about the

bodies found on the property. Trial Tr. 07/10/02 at 526-27; Wiersema-Ballet Report at 4, Appendix A.

When police spoke with Patricia Burnworth after the incident, she confirmed that Mr. Titus had visited her and Bonnie Huffman between 8:00 p.m. and 9:00 p.m. on November 17. Wiersema-Ballet Report at 4, Appendix A. Ms. Huffman also participated in an interview with the police and apparently did not contradict this version of events. *Id.* Believing Mr. Titus' alibi to be solid, the detectives cleared him as a suspect. Wiersema Affidavit at 3, Appendix B. Eventually, the case went cold. Trial Tr. 07/09/02 at 271.

In 2000, a cold case team at the Kalamazoo County Sheriff's Department reopened the investigation. Trial Tr. 07/09/02 at 268. Despite the lack of physical evidence tying him to the crimes, the cold case team turned back to Mr. Titus. *Id.* at 272. Relying primarily on comments he had made in the intervening years and Ms. Huffman's newfound belief that she saw Mr. Titus much earlier than 8:00 p.m. the night of the killings, the prosecution charged Mr. Titus with murder. Trial Tr. 07/17/02 at 1127; Trial Tr. 07/17/02 at 1130.

## II.      Trial and Conviction

After a jury trial in the Kalamazoo County Circuit Court presided over by the Hon. Philip D. Schaefer, Mr. Titus was convicted on July 19, 2002, of two counts of first-degree premeditated murder, MCL 750.316(1)(a), and two counts of felony-

3

firearm, MCL 750.227B-A. On August 19, 2002, Judge Schaefer sentenced Mr. Titus to life in prison without parole for the murder counts, with an additional mandatory two years for the felony-firearm counts.

### III.   Procedural History

On April 27, 2018, after an unsuccessful direct appeal, a habeas petition, and a state post-conviction motion, Mr. Titus submitted a petition for a successive writ of habeas corpus. On September 30, 2019, this Court adjourned disposition of Mr. Titus' petition so that the Conviction Integrity Unit of the Michigan Attorney General's Office could conduct an investigation to determine whether there is evidence that Mr. Titus was wrongfully convicted. Now that the investigation is complete, Mr. Titus asks the court to grant an unconditional writ of habeas corpus based on newly discovered evidence establishing that the State committed a violations of *Brady v. Maryland*.

### ARGUMENT

I.   **<u>Mr. Titus is Entitled to a Writ of Habeas Corpus Because *Brady* Was Violated When Investigators Failed To Disclose Evidence of an Alternative Suspect.</u>**

In June 2020, undersigned counsel for Mr. Titus learned of critical exculpatory evidence that police investigators had failed to disclose to the prosecution and to Mr. Titus' defense counsel before trial. The undisclosed evidence strongly points to a different suspect, Thomas Dillon, as the true killer of Mr. Estes

and Mr. Bennett. Dillon was a serial killer who roamed the countryside shooting hunters and outdoorsmen. He was arrested in 1993 and ultimately pleaded guilty to five counts of first-degree murder in Ohio in order to avoid the death penalty. Detroit Sun. Journ. 11/19/95, at 13,

Mr. Titus' prior counsel argued at trial that the true killer was a man who had driven his car into a ditch adjacent to the Fulton State Game Area shortly after the murders had been committed, and counsel suggested that this man was Charles Lamp. Trial Tr. 07/09/02 at 279. However, the recently discovered evidence implicates Thomas Dillon, a confessed serial killer of hunters and outdoorsmen, as the man who drove into the ditch just minutes after he killed Doug Estes and Jim Bennett.

Helen Nofz testified at trial that after receiving a call from a neighbor, she and her son ventured down to the road to help the driver stuck in the ditch. Trial Tr. 07/16/02 at 990. She described his demeanor as "nervous" and "upset." *Id.* She also recalled that he was sweating and did not want her to call the police for help. *Id.* Shortly thereafter, **Ms. Nofz provided information about the man in the ditch for a composite sketch. The sketch bears a striking resemblance to Thomas Dillon, who was arrested in 1993 for murders some two years after the Fulton Game Area murders**. Trial Tr. 07/16/02 at 992; Dillon Comparison, Appendix K.

5

On February 9, 1993, Detective Wiersema and Lieutenant Terry Van Streain accompanied Ms. Nofz and her son, Derek, to the Coshocton County Sheriff's Office in Ohio for a lineup of potential suspects. Coshocton Lineup Report, Appendix D; Wiersema Affidavit at 3, Appendix B. Ms. Nofz and Derek selected the man they believed most resembled the driver they saw on November 17, 1990. Nofz Affidavit at 2, Appendix O; Wiersema Affidavit at 3, Appendix B. **FBI records state that Ms. Nofz and Derek positively identified Dillon as the person in the ditch near the Fulton Game Area on November 17, 1990.** FBI Lineup Report at 2, Appendix E.

Police investigators also learned in 1993 that Thomas Dillon owned a car that closely resembled the description of the vehicle spotted in the ditch near the crime scene. KCSD Condensed Docs. at 1, Appendix C. In 1990, detectives with the St. Joseph and Kalamazoo County Sheriff's Departments had interviewed Helen Nofz about the car she had seen in the ditch on November 17, 1990. KCSD Condensed Docs. at 30-31, Appendix C. Ms. Nofz told police the vehicle she saw was a small two-door, hatchback-style black car, with a broken right rear tail light covered with duct tape. *Id.* at 30. The tail light did not wrap around the side of the vehicle. *Id.* The front bumper was black and had a rough finish. *Id.* She could not determine the exact make of the vehicle but believed it was probably a 1985 model or a little newer. *Id.* When Ms. Nofz perused a motor vehicle identification booklet, she could not

identify the exact vehicle she saw, but she noted that a 1987 Dodge Shadow looked very similar to the car she saw in the ditch. *Id.* at 31.

**The description Ms. Nofz gave of the car driven into the ditch is very similar to a 1988 gray Chevy Cavalier, which was registered to Dillon**. *Id.* at 1; Gray Chevy Cavalier, Appendix L. Ms. Nofz said that the man commented that he had been driving his wife's car that day. KCSD Condensed Docs. at 30, Appendix C. Dillon also admitted to driving the Cavalier during at least one of his other kills. Trombitas FBI Report at 1, Appendix M.

By 1993, investigators also learned that Dillon had borrowed two shotguns on November 16, 1990, the day before the Fulton Game Area killings, which had been committed with two distinct types of shotgun ammunition. Charles Shaffer, who worked with Dillon at the Canton Water Department, told investigators that he lent his Remington 870 and slug barrel and bird shot barrel to Dillon on the day before a deer hunt at the Ravenna Arsenal in Ohio. KCSD Condensed Docs. at 2-3, Appendix C. The annual hunt was scheduled at the Ravenna Arsenal on Saturday, November 17, 1990. *Id.* at 5. A week later, Mr. Shaffer said that Dillon returned the gun to him without the extra bird shot barrel but said that he had used it to shoot a buck at the Ravenna hunt. *Id.* at 2.

Dillon also borrowed that same day a Mossberg pump shotgun from another coworker, Tyler Converse. *Id.* at 4, Appendix C. Mr. Converse said Dillon also

approached him in late November, asking him if he could borrow his shotgun to go hunting at the Ravenna Arsenal. *Id.* A short time later, Dillon returned the shotgun to Mr. Converse and said he had used it to shoot a deer at the Ravenna hunt. *Id.* However, Dillon did not mention that he had also borrowed a shotgun from Mr. Shaffer. *Id.* Because Dillon only shot one deer on November 17, 1990, he must have lied to at least one of his coworkers. *Id.*

Autopsies of the victims revealed Mr. Estes had been shot with a shotgun slug, while Mr. Bennett had been shot with a double-ought buckshot. Trial Tr. 07/10/02 at 499. **The use of two different shotguns is consistent with the theory that Mr. Estes and Mr. Bennett were killed using two types of shotgun ammunition**.

The final piece of evidence that incriminates Thomas Dillon was provided by a man who met Dillon in jail in 1993. Michael Chappell was incarcerated for a marijuana offense at the Lake County Jail in Painesville, Ohio, when he met Thomas Dillon. FBI Chappell Notes at 1, Appendix H; Chappell Affidavit, Appendix P. Mr. Chappell said Dillon introduced himself as the guy who was accused of shooting hunters. FBI Chappell Notes at 1, Appendix H. Mr. Chappell said **Dillon spoke of a "double header" on one occasion in which he shot two men 30 yards apart in the woods.** *Id.*; Chappell Affidavit, Appendix P. Mr. Estes' and Mr. Bennett's bodies were discovered approximately 15 feet apart. CCCAT News Release 05/30/00,

Appendix J. Dillon said police could not prove he was in the county when the killings occurred. FBI Chappell Notes at 1, Appendix H.

Soon after this conversation, Mr. Chappell was moved to the Milan Federal Prison, where the FBI interviewed him about Dillon's "double header murder." Chappell Affidavit, Appendix P. In October 2020, Chappell spoke with a journalist who showed him the composite sketch of the man Ms. Nofz saw in the ditch. Documentary Pt. II Tr. at 37, Appendix I; Chappell Affidavit, Appendix P. Chappell said that the man looked very much like Dillon. *Id*.

On June 16, 2020, undersigned counsel filed a FOIA request to the Kalamazoo County Prosecutor's Office to determine if any of the above information about Dillon had been turned over to the prosecutor. KPCO FOIA at 1, Appendix F. On July 9, 2020, Assistant Kalamazoo County Prosecutor Heather Bergmann responded to the FOIA by stating that the office had no information in its file mentioning Thomas Dillon. *Id.* at 2.

In 2021, Mr. Titus confirmed that he had never heard the name Thomas Dillon, nor of any positive identification of the man in the ditch, before 2020. Titus Affidavit, Appendix Q.

The State violated *Brady* when it failed to turn over to the defense the evidence about Thomas Dillon that was found in the files of the Kalamazoo County Sheriff's Department in 2020. It does not matter that the cold case team and the prosecutor

were apparently unaware of this evidence when Mr. Titus was tried because the "prosecution team" includes the police agencies who investigated the case. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

The suppressed evidence was material. Had the jury heard that Thomas Dillon, a confessed and convicted serial killer of hunters, had been identified as the man in the ditch, that Dillon had borrowed two shotguns the day before the murders and lied to the owners of those guns when he returned them, that Dillon's wife drove a car matching the description of the car in the ditch, and that Dillon had told a man that he had killed two hunters on an occasion that the police did not know about, a different outcome was extremely probable.

Therefore, Mr. Titus requests the petition be amended to include this *Brady* claim. Given the evidence of Mr. Titus' innocence,[1] this Court should issue an unconditional writ so that Mr. Titus may be released from custody forthwith.

---

[1] In addition to the *Brady* material, the prosecution's key witness, Bonnie Huffman, recanted her trial testimony in 2020. Ms. Huffman made statements to journalists on two occasions that year confirming she did not see Mr. Titus on the day of the murders until around 8 p.m., some three hours after the shootings. Podcast Ep. 11 at 28-30, Appendix G. This directly contradicts the testimony that Ms. Huffman gave at trial that she saw Mr. Titus near the crime scene around the time of the shootings at 5:15 p.m. Trial Tr. 07/10/02 at 546, 549. Since Ms. Huffman was the only witness who ever placed Mr. Titus near the crime scene around the time of the shootings, her recantation provides further evidence of Mr. Titus' innocence.

10

## CONCLUSION AND RELIEF REQUESTED

For all of these reasons, Mr. Titus respectfully asks that this Court permit this

amendment to the pending petition and grant an unconditional writ of habeas corpus.

Respectfully Submitted,                    **MICHIGAN INNOCENCE CLINIC**

_s/David A. Moran_ (P45353)                _s/Imran J. Syed_ (P75415)
Attorney for Defendant                     Attorney for Defendant


_s/Elizabeth Cole_ (PA Bar No. 327703)     _s/Alexis Franks_
Attorney for Defendant                     Student Attorney for Defendant


_s/Naomi Farahan_                          _s/Olivia Daniels_
Student Attorney for Defendant             Student Attorney for Defendant


**Dated: February 22, 2023**