# <u>APPENDIX A</u>

Bruce Wiersema & Roy Ballet

Police Report

December 3, 1990

# KALAMAZOO COUNTY
## SHERIFF'S DEPARTMENT

**SUPPLEMENTAL REPORT**

FORM DATA 9 (1-81)

| | | APP. TICKET #|
|---|---|---|
| | 1.1 | 90-22452 |

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION

ORIGINAL

## SUPPLEMENTAL REPORT ON 90-22452

### FURTHER INVESTIGATION

As noted in the original supplement, dated 11/26/90, in regard to the campers at the parking area, who had left prior to the incident. DNR had supplied r/o with the camp registration card that had been located at the camp site, which is attached for informational purposes.

### INTERVIEW OF MARK ALLEN DAVIS

He is a white male, DOB: 08/09/68, 6'1", 240#, brown hair, brown eyes, 3600 3 1/2 Mile Road, Athens, MI, Tx: 729-4611, being a night baker at Dawn Donuts, Urbandale on Michigan Avenue. This being the subject who resided in the trailer just to the north of the JEFF TITUS residence, who was said to possibly have been hunting in the area at the time in question. Prior to contacting MARK at his residence, did make contact with his mother in law, MYRTLE MCSHERRY, 15190 South 46th Street, Tx: 729-5808, being the owner of the trailer, where MARK and her daughter, CINDA had been staying. MYRTLE advised that from what she can recall of that Saturday, that MARK did hunt in the morning from the crack of dawn until 8:00 or so, then had come into the trailer and went to bed, he slept through the day, did not hunt during the afternoon. MARK DAVIS advised that he does do alot of target shooting on the property and had been out hunting Saturday in the morning, however only in the morning. MARK advised that he hunts with a 20 gauge shot gun that he has and sometimes with a 22 rifle. He had slept through the day that day, prior to going into work, believed to be about 8:00 p.m., he had been woke up by his wife, CINDA prior to that, but had not been out hunting.

On 11/22/90, r/o received a investigative tip from MSP Coldwater in regard to them receiving information from an anonymous subject who works at Griswald Machine and Engineering on M-60 in Union City, that one of their employees by the name of JACK BADGER had been talking and bragging about the shot that he had seen two subject standing near one of the bodies and that he had heard a shot and someone yell help and saw a subject leaning against a tree and also another subject lying face down nearby, that he had walked over to one of the subject and saw a bilfold lying on the ground with some of its contents strewn about and saw one subject standing over the faced down body and two subjects run across a field to a car, get in and drive away when they saw BADGER.

The informant advised that BADGER had changed his story a number of times and the caller agreed that this information should be called in. With that information, r/o travelled to the Griswald Machine and Engineering in Union City and identified the subject doing the talking as JACK BADGER and obtained his home address from that location.

R/o proceded to the address and made contact with JACK ALLEN BADGER, JR. w/m, DOB: 02/28/63, 1193 "M" Drive South, East Leroy, MI, Tx: Unlisted/729-9774, he is 5'10", 165#, bearded, brown hair, brown eyes, Tx: 729-5597. BADGER was questioned as to his knowledge of the incident. At that time had advised that he had mentioned to people at work that he had been at the scene of where the incident took place, however he stated that he never told anybody that he saw bodies or any such thing, but that he had heard this while out at the CLARENCE JONES residence on the corner of 46th and "X" Avenue, being the Junk Yard. He advised that he went out to the house to pick up some clothing for TROY JONES, who resides at the Junk Yard with his father, CLARENCE and they had heard when they got there that some guys had gotten

| PROP-ERTY | CLASS | EST. VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | TOTAL EST. VALUE | | UNFOUNDED | | INACTIVE (NOT CLEARED) | | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | | | | | PARTIAL |
| INVESTIGATING DEP | | | | EMP # | | CASE CLOSED BY | | | DATE | | CLEARED EXCEPTIONAL | | CLEARED BY ARREST | | | NONE |

| APP TICKET # | |
|---|---|
| FILE CLASS | COMPLAINT # |
| 1.1 | 90-22452 |

FORM DATA 9 (1-81)

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION:

## PAGE 2

shot out in the State Game area from TROYS mom and further that CLARENCE JONES was out in the woods looking for RON ELWELL, due to the fact that Mrs. ELWELL had called the JONES house, telling them that a young man had asked them for help and that ELWELL had went out there with them alone and she wanted CLARENCE to go check on them. Then the boys, TROY and JACK BADGER started into the woods and were met by CLARENCE JONES coming back out and never did get into the scene area. He advised that while there he saw one of the ambulance guys being, BOBBY BURGETTE from Spencers Ambulance, in Athens, the he knew, this subject had no further information to divulge.

Subjects who were at the scene identified by Sergeant KEELAN, shortly after the incident were recontacted by r/o and Detective BALLETT, making contact with MARK LAWRENCE at his place of employment. Found from MARK that he was out with the other 4 hunters listed, that they had parked in the area on "Y" Avenue to the west of the Bear Creek, which is opposite of the scene.  While there had heard the two shots and felt a minute of so had past and then he heard some yelling, what he described as moaning, this being near dark and after hearing the yelling started east bound through the swamp area into Bear Creek, trying to get across as he is a paramedic and wanted to go check to see if he could be of some assistance, however turned back when he could not make it through the creek and gathered up the other hunters that were with him, rendezvoused and decided that they would go back to the vehicle, go around to the other side of Bear Creek, where they had heard the yelling coming from, to check and see what the problem was and by the time they had got there, there was an ambulance and an ambulance attendant coming out of the woods area. He asked them if they needed help and they replied that they did not, he did not go any further into the scene area.  In addition advised that the dark colored Olds Cutlass, being a 1978 or 1980 model that he had seen in the parking area, was seen off the "Y" Avenue parking area and did not recognize the vehicle.

LAWRENCE further advised that after rendezvousing with his other hunters, that they did run into an Oriental or Vietnamese looking individual and in talking with this subject noted that he too was on the west side of the swamp and creek area and that it was possible that this individual had hooked up with his other hunter friends as they had lost sight for a time after they observed him leaving in his pick up truck and further that the subject was not wet from wading a swamp or a creek and it was unlikely that this individual would have been on the east side near the scene.

Attached is a rough diagram of LAWRENCE and his friends location hunting.

## REINTERVIEW WITH PHILLIP DOOLIE

R/o contacted his residence and advised that he too was hunting on the west side of Bear Creek off of "Y" Avenue and further north.  He did hear some shots over to the east that they had arrived and parked off of "Y" Avenue, around 3:30 to 4:00 p.m., went into the woods heading south on the west side of the creek, heard yelling, what he figured was almost 5:30 p.m. when it was getting dusk.  He heard a bunch of yelling, wondered what was wrong and went to find BILLY, talked over what to do and found BOB and then yelled to get the other person in the party, they then started back to their vehicles parked in the parking area, to make the trip around the State Game area to the east side access, arriving to find that the ambulance was there and that two hunters had been shot.  He advised that they had driven out there in MARKS Ford Ranger, green and tan and BOBS green and brown primer power wagon.  WILLIAM PALMATEER advised same as the other witnesses, which were hunting together, but did add that he felt that there were approximatley 20 minutes or so between hearing the shots and hearing the yelling, that they never did make it back into the scene area, but had went around to check and heard that the hunters had been s

| PROP-ERTY | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST. VALUE | TOTAL EST VALUE | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | | PARTIAL |
| INVESTIGATING DEP | | | EMP # | | CASE CLOSED BY | | | DATE | | CLEARED EXCEPTIONAL | CLEARED BY ARREST | | NONE |

**KALAMAZOO COUNTY**
**SHERIFF'S DEPARTMENT**
UPPLEMENTAL REPOF

| | | APP TICKET # | |
|---|---|---|---|
| | | FILE CLASS | COMPLAINT # |
| | | 1.1 | 90-22452 |

FORM DATA 9 (1-81)

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION·

## PAGE 3

shot.

On 11/29/90, r/o was contacted by KIM TRACY, girlfriend of JIM BENNETT, advised that JIM had hunted in the morning at his mothers land only, had hunted previously on opening day with the family, being JACK, TERRY and FRED.  Friday, the 16th had went by himself and advised that on Saturday she had worked days that day and that JIM was home when she got home from work and he said that he was going to go hunting and left the house at 4:38 p.m.  She added that no one had went with him and no mention was made of anybody hunting with him.

## INTERVIEW WITH GARTH SNOW

He is identified as being at the scene.  Refer to Detective BALLETTS supplement.

## FURTHER INVESTIGATION

R/o was given information undated, unsigned in regards to calls that had come into KCSD with information and in particular HELEN NOFZ, 15962 East "Y" Avenue, Tx: 729-5134.  She had called and advised that at about 5:00 p.m. on Saturday, 11/17/90, had observed a small black hatch back automobile that had swerved to avoid a deer and end up in a ditch.  The driver being a white male, 30 years, wearing gold, round, wire rimmed glasses, wearing a camel colored jacket and a blaze orange hat, described as being a little bit heavy.  R/o in contacting NOFZ who is a teacher at the Athens Vocational Education Center, Tx: 968-2271 ext:  266, found that she had received a call from a neighbor at about 5:00 p.m. that a man had gone into a ditch and may need some help.  The neighbor originally calling for Mrs. NOFZ husband, however he was not home, Mrs. NOFZ and her eight year old son went down to the corner and at that time observed the vehicle in a ditch, further observed that the vehicle was nose down in a ditch, facing a south western direction toward the corner post and overheard the driver saying that he was west bound on "Y" Avenue and a deer ran across and did not want wreck the wifes car and swerved and became stuck in the ditch.

The subject was very upset, added that the drive of this small black car was sweating profusely and felt the vehicle was possibly a Dodge.  Further, she added that the vehicle had what appeared to be previous damage to the right rear tail light, which was repaired with duct tape.  The front bumper was pushed down under the vehicle somewhat as a result of going off the road.  She states that the subject having the blaze orange hat on, had unknown hair color, but was round faced.  She further added that there was what she recalled as being a black or dark blue truck that sat high, believed to be a 4 wheel drive at that location at the corner, with an individual helping to pull the vehicle out.  The driver of this truck was a white male, probably about 30 years of age, no further description, did not know the individual, but feels he might be a resident in the area.  The black truck when leaving went north on 46th Street and the vehicle that had been stuck went south on 46th Street.

R/o received a call from BONNIE SHERMAN HUFFMAN, who is employed at the Vicksburg Ambulance Service, Tx: 649-1474, in regard to having information that a person had ran a stop a sign and went into a ditch near the shooting, being about 5:00 p.m. on Saturday, 11/17/90.  She added that when a local person stopped to help the person, the person acted very strange and turned down any help and acted as if he did not want anyone near him.  Originally, she had reported that she had information as to car description and knew the person who came to help.  R/o made contact with HUFFMAN at her place of employment, identified her as BONNIE JUNE SHERMAN HUFFMAN, w/f, 35 years of age, DOB:  05/22/55, 207 Haynes Street, Vicksburg, MI Tx:  649-1474.  She advised that she was at her parents property being the BURNWORTH farm, 15573

| PROP-ERTY | CLASS | EST. VALUE | CLASS | EST. VALUE | CLASS | EST. VALUE | CLASS | EST. VALUE | TOTAL EST. VALUE | UNFOUNDED | | INACTIVE (NOT CLEARED) | | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | | | | |
| INVESTIGATING DEP. | | | | EMP # | | CASE CLOSED BY | | DATE | | CLEARED EXCEPTIONAL | | CLEARED BY ARREST | | PARTIAL / NONE | |

KALAMAZOO COUNTY
SHERIFF'S DEPARTMENT
**SUPPLEMENTAL REPORT**

| | APP TICKET # |
|---|---|
| FILE CLASS | COMPLAINT # |
| 1.1 | 90-22452 |

FORM DATA 9 (1-81)

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION.

PAGE # 4

South 46th Street and at approximately 5:00 p.m., while she was hunting in the south west corner of the property, near the intersection of 46th and "Y" Avenue, heard a vehicle racing, what she thought was southbound on 46th Street. It sounded like the vehicle missed a turn and went into the ditch. She stated that she could not see the vehicle nor anyone else, but she could hear a male voice and could hear that the attempts were made to extract the vehicle from his ditch. She added that she heard what she thought were about three different people stop by to help and that the male voice had refused help and added that the last one to stop and offer was a man and the guy refused, after that point the guy said, okay be that way, I'll call the law, to which the stuck motorist said, no don't, I'll get out, which she thought was someone suspicious.

Again, BONNIE did not see any vehicles or subjects, but could only overhear. R/o also spoke with PAT BURNWORTH, owner of the property at the given address, Tx: 729-4570, who advised that both she and BONNIE had heard what she thought were 5 shots sometime around 4:30 to 5:00 p.m. added that three shots were close together and then 3 to 4 minutes later, two more shots and that is all she knew. She added that she did hear about the shootings later that evening from JEFF TITUS, being a neighbor on 46th Street, who came to her residence about 8:00 p.m. to 9:00 p.m. and was telling her about it. With this information regarding the vehicle that had been stuck in the area, as well as the vehicle that was used to pull it out, r/o put out information to news agencies regarding request for information regarding these vehicles and drivers for further lead information. No further information has surfaced at this time.

**INTERVIEW WITH TERRENCE NEIL BENNETT**

He is a white male, 36 years of age, DOB: 05/17/54, 62501 McHale Road, Burr Oak, MI, 49030, Tx: 489-2758. TERRY was contacted at his place of employment, VanGaurd Equipment, Colon, MI. TERRY being the brother of the deceased, JAMES BENNETT. He advised that on Saturday, 11/17/90, he did not hunt at all, had stayed home and heard later from his sister, SHERRY on Saturday night that JIM had been shot. He advised r/o that he had heard that a LEE SMITTENDORF who owns some property on "Y" Avenue near Fulton had given JIM permission to hunt on his land previously and was surprised to hear that JIM had been on the State Game land. Further, he added that TOM LAFFLER who resides in the Fulton area on a dirt road, heard that TOM was saying that he had seen JIM laying up against a tree after the shooting and requested r/o to check this story out.

R/o and Detective BALLETT ultimately did contact THOMAS CLEON LAFFLER, w/m, DOB: 02/26/46, 13301 East "Y" Avenue, Tx: 778-3517, at his residence and found from TOM LAFFLER that he had never said such a thing, did hear about the shooting and had followed a Sheriff's car going through Fulton out to the scene, never did go back into the scene area and did advise that he was out there about 6:00 p.m. and did not know anymore about it.

It appears at this time that all individuals who are identified as being at the scene had in fact been on the west side of the property and that GARTH SNOW is the only other known hunter to be on the east side of Bear Creek in the vacinity. That other people who have been identified are residence of the area who were somehow notified or contacted of the goings on after the bodies had been found by BOBBY BROWN and help was summonsed.

**STATUS**

This case remains open, no additional leads at this time.

Respectfully submitted:

| PROP-ERTY | CLASS | EST. VALUE | CLASS | EST. VALUE | CLASS | EST. VALUE | CLASS | EST. VALUE | TOTAL EST VALUE | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | PARTIAL | |
| INVESTIGATING DEP | | | | | EMP # | | CASE CLOSED BY | | DATE | CLEARED EXCEPTIONAL | CLEARED BY ARREST | NONE | |

**KALAMAZOO COUNTY**
**SHERIFF'S DEPARTMENT**    **SUPPLEMENTAL REPORT**

APP TICKET #

1.1    90-22452

FORM DATA 9 (1-81)

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|

ATT

DETAILS OF INVESTIGATION

PAGE 4 5

Respectfully submitted:

Detective Sergeant Bruce Wiersema
Detective Sergeant Roy Ballett

/m
12/03/90

| PROP-ERTY | CLASS | EST VALUE $ | CLASS | EST VALUE $ | CLASS | EST VALUE $ | CLASS | EST. VALUE $ | TOTAL EST. VALUE $ | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INVESTIGATING DEP | | | | EMP # | | CASE CLOSED BY | | | DATE | CLEARED EXCEPTIONAL | CLEARED BY ARREST | PARTIAL / NONE |

# <u>APPENDIX B</u>

Bruce Wiersema Affidavit

June 8, 2021

### Affidavit of Bruce Wiersema

**BEFORE ME**, the undersigned Notary, _FRANK BARBER_____, on this **8TH** day of _JUNE_, 2021 personally appeared Bruce Wiersema, who being by me first duly sworn, on his oath, deposes and says:

1. My name is Bruce Wiersema, and I make this affidavit from personal knowledge of the matters addressed herein.

2. I was a Detective Sergeant in the Kalamazoo County Sheriff's Department. I began my work with the department in 1972. By November of 1990, I had been a Detective for eight years.

3. I was on call the night of November 17, 1990, and was called to investigate the double homicides of Doug Estes and James Bennett. I became the lead investigator on that case after the initial investigation.

4. Our investigative team determined that the shots that killed Estes and Bennett were fired between 4:30 and 5:30 PM on November 17.

5. Everything I wrote in the original police report is accurate, and I stand behind all of the statements that I made at that time. I have attached my original police report as Exhibit A to this Affidavit.

6. As a general practice, I would write reports of the incident as events occurred or as new information was brought to me. What I was writing was still fresh in my mind when I wrote reports, which, most of the time, happened within a few days.

7. The initial report I wrote for the Bennett/Estes investigation was done on the same day as the incident, November 17. Most of my reports related to this investigation were written within a few days after the events.

8. After Bonnie Huffman called the Kalamazoo Co. Sheriff's Department to report a suspicious person who had crashed his car into a ditch near the crime scene around the time of the murders, we contacted her and set up an interview at the ambulance service in Vicksburg.

9. Ms. Huffman told me in this interview on or about November 29, 1990, that she was hunting on her parents' property, the Burnworth property, near the Fulton State Game

Area. She told us that she spent the afternoon in a hunting blind near the southwest corner of her parents' property, by the intersection of 46th and "Y" Avenues.

10. While in the hunting blind, she heard three shots in succession and, three to four minutes later, two more shots. This occurred at some point between 4:30 and 5:00 p.m.

11. Ms. Huffman also told me during this interview that around 5:00 p.m. on November 17, 1990, she heard a vehicle miss a turn and go into a ditch. She said that the driver of the vehicle was a man, and that, while many people offered to help extract the man's vehicle from the ditch, the man refused help.

12. Ms. Huffman reported that she continued to hunt on the property until it began to get dark, and then she went back to her parents' home.

13. I wrote all of these details that I gathered during the interview with Bonnie Huffman in my police report dated December 3, 1990.

14. After I interviewed Bonnie Huffman, I set up an interview with Patricia Burnworth, Ms. Huffman's mother and one of the owners of the property that neighbored Jeff Titus's property.

15. Ms. Burnworth told me that Mr. Titus arrived at the Burnworth residence after dark on November 17, 1990, but before they had sat down to dinner, which usually occurred around 10:00 p.m. Ms. Burnworth indicated that the time he arrived was around 8:00-9:00 p.m., after it had already become dark outside. She indicated that Mr. Titus came to their residence to discuss the shootings that had occurred that day.

16. I spent at least three months investigating this case. It was my primary responsibility, and I worked on it every day during those three months. I was assigned as lead investigator, even though I did not have enough experience investigating homicides. In my opinion, the investigative team was understaffed. I felt personally overwhelmed and felt the case deserved more of a team approach but the department refused offering any full-time assistance.

17. We never developed a prime suspect in our investigation of the Estes and Bennett double homicide. The case was never closed; it sat dormant due to the fact that we had no significant leads at that time.

18. I told Mr. Titus's defense attorney that Mr. Titus had been eliminated as a suspect. Although I received a subpoena, I was never called to testify at Mr. Titus's criminal trial nor was I ever formally interviewed by defense counsel.

19. But I did testify to, among other things, the mismanagement of this case at the civil trial of *Jan Estes v. Jeff Titus*.

20. If I had been called to testify at the criminal trial of Mr. Titus, I would have verified all of the information in the police reports that I wrote was accurate and would have further testified to everything put forth in this affidavit.

21. In particular, I would have testified at the trial that Bonnie Huffman and her mother, Patricia Burnworth, both confirmed when I interviewed them in November 1990 that Mr. Titus came over to discuss the homicides between 8:00 and 9:00 p.m. on November 17, 1990, not at the much earlier time they testified to at Mr. Titus' criminal trial.

22. I testified in the civil trial that I interviewed Bonnie Huffman as part of my investigation and that it was not until May 23, 2004, almost 14 years after my investigation, that I heard that she claimed to have seen Jeff Titus at 5:15 p.m. on the night of the crime. During the initial investigation in 1990, Ms. Huffman told me that she did not see Mr. Titus until 8:00 or 9:00 p.m. that evening. Her testimony at the criminal trial that she saw him at 5:15 p.m. was a substantial deviation from her original statement to me.

23. After the murders in 1990, I started investigating whether an individual named Thomas Dillon may have killed Doug Estes and Jim Bennett.

24. I interviewed Helen and Derek Nofz, who heard about an individual who drove into a ditch at approximately 5 p.m. on November 17, 1990, one half mile from where Doug Estes and Jim Bennett were killed. Helen and Derek Nofz then went down to the intersection to investigate.

25. In February 1993, I arranged for a line-up to occur at the Coshocton Co. Sheriff's Department in Ohio to see if Helen and Derek Nofz could identify Thomas Dillon. Lt. Van Streain and I accompanied Helen and Derek Nofz to the department. In my presence, Helen and Derek Nofz selected Mr. Dillon as the person who most resembled the driver in the ditch on November 17, 1990.

26. Lt. Van Streain and I dictated a report on the Ohio line-up in February 1993 and the possibility of Mr. Dillon as a suspect, but for reasons unknown to me, the report was later misplaced amongst KCSD files and cannot be located.

27. Our team eventually eliminated Thomas Dillon as a suspect when it was discovered he had a potential alibi. On the morning of November 17, 1990, Mr. Dillon had been hunting in Ravenna, Ohio. At 11:20 a.m, Mr. Dillon tagged a buck at the check station at the

Ravenna Arsenal, which is located approximately 268 miles from the Fulton State Game Area in Michigan, where the murders occured.

28. I did not share this information regarding the line-up when the KCSD investigators reopened the cold case ten years later, the prosecutors who tried Jeff Titus for the double homicide, or the defense attorneys retained by Jeff Titus.

29. If called to testify in this case now, I would do so in accordance with the statements above.

FURTHER, YOUR AFFIANT SAYETH NOT.

_____
[Signature of Affiant]


Bruce A. Wiersema
[Print name]

Frank Barber
Notary Public - State of Michigan
County of Kalamazoo
My Commission Expires May 13, 2026
Acting in the County of KALAMAZOO


6 - 8 - 2021
[Date]

# **APPENDIX C**

KCSD Documents Re Thomas Dillon and Man in the Ditch

1990-1993, Turned Over Via FOIA, June 2020



**MICHIGAN LAW**
UNIVERSITY OF MICHIGAN

**Michigan Innocence Clinic**
David A. Moran, Director

June 16, 2020

FOIA Coordinator
Kalamazoo County Sheriff's Office
1500 Lamont St.
Kalamazoo, MI 49048
ATTN: Records Section
(

Dear FOIA Coordinator:

Pursuant to the Michigan Freedom of Information Act, the Michigan Innocence Clinic requests **police reports, progress notes, witness/suspect statement, sketches, and all other disclosable documents** which mention, either directly or indirectly, **Thomas Dillon or Thomas Lee Dillon** in relation to the following:

**Incident type:** Homicide

**Date:** November 17, 1990

**File/Case No.:** 90-22452

**Location:** Fulton State Game Area

**Victim Names:** Doug Estes, Jim Bennett

**Suspect Arrested:** Jeff Titus

If you have any questions regarding this request, please contact us by telephone: 734-763-9353

**MICHIGAN INNOCENCE CLINIC**

Adam Bean
*Student Attorney*

---

701 S. State St.                    T: 734-763-9353    F: 734-764-8242                    Please recycle 
Ann Arbor, Michigan 48109-3091

**NAME:** THOMAS L. DILLON                    **SEX:** MALE       **RACE:** WHITE

**DOB:** 09 JUL 50    **SSN:** 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     **HT:** 5/10 **WT:** 190    **HAIR:** BRO **EYES:** BRO

ˑRESS: 2390 CRESCENT DALE S.E. MAGNOLIA, OH 44646   (216) 866-3744

**MARITAL STATUS:** MARRIED                        **HOW LONG:** 10-11 YEARS

**SPOUSE'S NAME:** CATHERINE L. DILLON   **DOB:** 04 JUL 50   **SSN:** 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

**CHILDREN'S NAMES:** JONATHAN DILLON; 6TH GRADE EAST SPARTA ELEMENTARY

**EMPLOYMENT:** CITY OF CANTON—CANTON WATER WORKS     **HOW LONG:** SINCE 1972

**JOB DUTIES:** ENGINEER

**SUPERVISOR'S NAME:** MR. DAVE WILLIAMS

**EDUCATION:** OHIO STATE GRADUATE — DEGREE IN JOURNALISM

**LIFESTYLE:** WORKS MONDAY THRU FRIDAY (MOST OF TIME). GOES OFF BY HIMSELF ON
WEEKENDS AND HOLIDAYS

**PERSONALITY:**

**CLOSE FRIENDS/ADDRESSES:** ONLY ONE:  RICHARD H. FRY, 2330 HILLWOOD S.E.
ˑ NOLIA, OH.  THIS IS SAME RESIDENTIAL AREA THAT DILLON LIVES IN.

**ALCOHOL AND DRUG USE:** HEAVY ALOCOHOL USE

**TYPE STORES FREQUENTED:** DRIVE THRU

**TYPE BARS FREQUENTED:** NONE KNOWN

**TYPE VEHICLES USED:** 1987 RED TOYOTA PICKUP TRUCK OH REG NT84MS
                       1988 GRAY CHEVY CAVALIER  OH REG GIN-513
                       1982 SUZUKI MC  OH REG CH524

**HABITS:** DRIVING AROUND

**HOBBIES:** TARGET SHOOTING; ATTENDING GUN SHOWS

**CRIMINAL HISTORY:** 2-28-75:  PETTY THEFT—STARK COUNTY
                      8-10-91   POSSESSION OF SILENCER—FEDERAL

CAPTAIN DANE SHRYOCK
THOMAS DILLON
REF: MR. SHAFFER --- REMINGTON 870

My name is Captain Dane Shryock of the Coshocton
County Sheriff's Department, 328 Chestnut Street, Coshocton,
Ohio 43812.  Dispatch phone number: 614-622-2411.  My private
phone number:  614-622-2310.

Talked with Mr. Charles Shaffer, a co-worker of Mr.
Tom Dillon at the Water Department.  Mr. Shaffer has worked
there for quite some time.  Knows Mr. Dillon.

Mr. Shaffer's phone number: 216-879-5390.  His
Social Security number:  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.

Mr. Shaffer was contacted originally by a Detective
from Stark County and also Lt. Mosier and Sgt. Lawrence of
Coshocton County in regard to his knowledge and acquaintance
with Mr. Dillon.  Nothing out of that conversation, which we
already have a copy of, did Mr. Shaffer provide information
concerning a firearm that he lent to Mr. Dillon.  So this
officer contacted Mr. Shaffer by phone and inquired if he
ever lent a gun to Mr. Dillon and Mr. Shaffer indicated that
yes he did, and basically the following is a scenario that he
gave: in/about November 17th, or that neighborhood, of 1990.
Mr. Dillon contacted Mr. Shaffer wanting to know if he could
borrow his shotgun to go hunting at the Ravenna Arsenal in
Portage County because he didn't have a shotgun, and his name
had been drawn in the lottery to hunt there.  Mr. Shaffer
told him he could borrow his Remington 870 and gave him a
slug barrel and a bird shot barrel.  The bird shot barrel being
like a 28 or 30 inch barrel that was on the gun when he gave
it to Mr. Dillon.  Told Mr. Dillon he needed to clean both
the gun and the extra barrel when he gave them back to him and
that was the price for borrowing the gun.  Mr. Dillon indicated
that would be fine.  Took the gun.  According to Mr. Shaffer,
returned it a short time later, maybe a week at the most.
Told Mr. Shaffer that he killed a deer at the Ravenna Arsenal.
Showed him a picture of a buck.  Said he killed this deer at
the Ravenna Arsenal at Portage County.  However, Mr. Dillon
did not give Mr. Shaffer the extra barrel back.  When Mr.
Shaffer got the gun back it had the slug barrel on it and not
the bird shot barrel.  Mr. Shaffer inquired.  Mr. Dillon
said that the barrel was sitting at home in his bedroom and
evidently it got thrown away by his wife when she was
cleaning house or something happened and that he would get

MR. SHAFFER
REMINGTON 870
Page 2

Mr. Shaffer another barrel. Approximately 2 weeks later Mr.
Dillon gave Mr. Shaffer another 870 barrel that was wrapped
in brown paper and taped.  And Mr. Dillon told Mr. Shaffer
that he bought it at a gun show.

        Mr. Shaffer also indicated that he felt that since all
these news articles has come out that, that was bothering him
a little bit that Dillon borrowed his shotgun and didn't give
him his barrel back, and he was concerned of maybe Mr. Dillon
doing something criminally with his shotgun and that barrel
and felt that the barrel could be tied to the crime for
whatever reason, but that's purely speculation on Mr. Shaffer's
part.

***END OF STATEMENT***

### CAPTAIN DANE SHRYOCK
### THOMAS DILLON
### REF: MR. CONVERSE -- MOSSBERG PUMP SHOTGUN

My name is Captain Dane Shryock, Coshocton County Sheriff's Department, 328 Chestnut Street, Coshocton, Ohio 43812. Dispatch phone number: 614-622-2411. My private phone number: 614-622-2310.

Several times I've talked to Mr. Tyler Converse, an employee of the Water Department who knew Mr. Dillon quite well. You can reach Mr. Converse at the Water Department. That phone: 215-489-3308. He is a chemist there.

He indicated that on around the latter part of November, 1990 Mr. Dillon came to him, ask him if he could borrow his shotgun to go hunting at the Ravenna Arsenal with. Mr. Converse lent him a Mossberg Pump shotgun, model 500 he believes. A short time later Mr. Dillon returned the gun to him, thanking him for the use of it and said he killed a deer Ravenna Arsenal with that gun and thanked him for his help. He also did not tell Mr. Converse that he borrowed a shotgun from Mr. Shaffer, and he told Mr. Shaffer that he had killed a deer at the Ravenna Arsenal with his gun also. So Tyler was a little confused when Shaffer and he got together at work and each one of them were talking about Dillon borrowing the gun. Neither one of them knew that they lent the gun to Dillon at the same time and they thought that was relatively odd and also the fact that Dillon told them he shot a deer with each one of their guns when in fact he could have only used one of them. And Mr. Tyler Converse is also familiar with Mr. Shaffer and the story about the second gun barrel.

***END OF STATEMENT***

CAPTAIN DANE SHRYOCK
THOMAS DILLON
MR. MORGAN -- RAVENNA ARSENAL

My name is Captain Dane Shryock of the Coshocton County
Sheriff's Department, 328 Chestnut Street, Coshocton, Ohio 43812.
Dispatch phone number: 614-622-1411.  My private phone number:
614-622-2310.

On February 11, 1993 this officer contacted Tim Morgan.
216-358-7111, which is at the Ravenna Arsenal in Portage County,
Ohio.

The reason I contacted Mr. Morgan there is that the
Ravenna Arsenal they had annual deer hunts to weed out the deer
on this fenced in huge enclosure, Federal Ammunitions Enclosure
in Portage County and Mr. Morgan is responsible to help
coordinate those efforts.

He indicated to me that Mr. Dillon was there on November
17, 1990.  They've got him registered coming in the morning.
That he killed a deer there on their property and that their
officers tagged the deer about 11:20.  That information basically
comes from a deer harvest record from the Division of Ohio that
they fill out and send to the Wildlife Division.  We were able
to extract the successful harvest hunter record from the
division, and it indicates the time of 11:20 as when the deer
was checked and Dillon made the statement that he killed the
deer about 10:30 a.m.

Talking with Mr. Morgan, he said that Mr. Dillon has
checked in the morning and he's also still on the property
according to their checks for the noon check.  His scenario
states that if the tag shows 11:20 a.m. as the tag time, that
the officers would have tagged the deer in the field.  They
would have helped Mr. Dillon load it in one of the military
trucks and helped him exit the federal land with the deer.
Mr. Morgan's best case scenario is that Dillon never left
until after 12 o'clock noon on the 17th because they still
have him on the premises at the noon check and also the fact
that he didn't tag the deer until 11:20, which would take a
little bit of time for him to get the deer loaded, for them
to complete their rounds and get out to the parking lot.
So Mr. Morgan states that the best case scenario is Dillon
probably did not leave the property until after 12 noon.

Additionally, he is sending us via mail their records

MR. MORGAN
RAVENNA ARSENAL
Page 2

of Mr. Dillon entrance onto the property and their time checks
of when they know for sure he was there.  They do not check
somebody out.  They only indicate if they're still on the
property at certain times.

Basically, nothing more can be gained from Mr. Morgan
at this time.

***END OF STATEMENT***

**STRASBURG PROVISION — 878-5567**

PHONE _____ We Will Call When Ready

NAME _____

ADDRESS _____

DATE 11-17-90

DEER

CITY _____  County _____  State _____  1 0 4  NOV 2  Buck / Gun / Car One

Doe  Tag No. 50359

**HANDLES DEER MEAT ONLY TO INSURED WEIGHT**

SAVE

| DEER | | | | | lbs. | Finished Wt. | Tag No. |
|---|---|---|---|---|---|---|---|
| Round Steak | Yes | No | Pack | Thick | Trail Wt. | Finished Wt. | |
| Neck Roast | Yes | No | Pack | Thick | Summer Wt. | Finished Wt. | |
| Shoulder Roast | Yes | No | Pack | Thick | Kolbassi Wt. | Finished Wt. | |
| Chops | Yes | No | Pack | Thick | Smk'd Saus. Wt. | Finished Wt. | |
| Deer Burger | Yes | No | Beef | Pork | STIX Wt. | Weight | |
| Trail | Yes | No | | | SMOKE-HAM | | |
| Kolbassi | Yes | No | | | PROCESSING | | |
| Summer | Yes | No | | | BEEF | | |
| Smoked Sausage | Yes | No | | | PORK | | |
| STIX | | | | | TRAIL | | |
| Number Boxes Fresh | | Smoked | | | SMOKED SAUSAGE | | |
| | | | | | KOLBASSI | | TOTAL |

```
                              AUTOMAP V2.0

ickest route from Strasburg to Kalamazoo

me 5 hrs 37 min. Distance 288 miles.

--+--------------------------------+--------+----------+---+---------------------+--+
me!                                |Road    |For       |Dir|Towards              |  |
--+--------------------------------+--------+----------+---+---------------------+--+
:0|DEPART Strasburg (Ohio) on|U250    |9 miles   |NW |(Wilmot)             |  |
:1|At Wilmot stay on the     |U250    |20 miles  |W  |(                    |  |
:3|Turn left onto            |U30     |5 miles   |W  |Mansfield            |  |
:3|Turn right onto           |U250    |18 miles  |NW |Elyria               |  |
:0|At Ashland stay on the    |U250    |31 miles  |NW |Sandusky             |  |
:3|Turn left onto            |U20     |12 miles  |W  |(Bellevue)           |  |
:5|At Bellevue stay on the   |U20     |19 miles  |W  |(Fremont)            |  |
:1|At Fremont stay on the    |U20     |37 miles  |W  |                     |  |
:5|Turn right onto           |I475    |8 miles   |N  |Toledo               |  |
:1|Turn off onto             |U23     |4 miles   |N  |Ann Arbor            |  |
:1|At Sylvania turn off onto |U223    |45 miles  |NW |(Adrian)             |  |
:0|Go onto                   |U127    |12 miles  |W  |Jackson              |  |
:2|At Vandercook Lake stay on|U127    |4 miles   |W  |Jackson              |  |
:2|At Jackson stay on the    |U127    |3 miles   |NW |E Lansing            |  |
:3|Turn left onto            |I94     |29 miles  |W  |Chicago              |  |
:0|At Marshall stay on the   |I94     |28 miles  |W  |Chicago              |  |
:3|Turn off onto             |No name |4 miles   |NW |Kalamazoo            |  |
:3|ARRIVE Kalamazoo (Michigan|        |          |   |                     |  |
--+--------------------------------+--------+----------+---+---------------------+--+
```

AUTOMAP V2.0

ickest route from Ravenna to Kalamazoo

me 5 hrs 24 min. Distance 285 miles.

| me | | Road | For | Dir | Towards | |
|---|---|---|---|---|---|---|
| :0 | DEPART Ravenna (Ohio) on t | S44 | 1 mile | N | Mentor | |
| :0 | Turn left onto | S14 | 10 miles | W | (Streetsboro) | |
| :1 | At Streetsboro turn left o | I80 | 16 miles | W | Elyria | |
| :3 | At Broadview Heights stay | I80 | 10 miles | W | Elyria | |
| :4 | At N Royalton stay on the | I80 | 2 miles | W | Elyria | |
| :4 | At Strongsville stay on th | I80 | 10 miles | W | Elyria | |
| :5 | At N Olmsted stay on the | I80 | 9 miles | W | Elyria | |
| :0 | At Elyria turn off onto | I90 | 29 miles | W | (Milan) | |
| :3 | At Milan stay on the | I90 | 51 miles | W | (Fremont) | |
| :3 | Turn off onto | I280 | 6 miles | N | (Walbridge) | |
| :3 | At Walbridge stay on the | I280 | 3 miles | N | (Oregon) | |
| :4 | At Oregon stay on the | I280 | 4 miles | N | | |
| :4 | Turn off onto | I75 | 4 miles | S | Toledo | |
| :5 | Turn off onto | I475 | 3 miles | W | (Ottawa Hills) | |
| :5 | At Ottawa Hills turn off o | U223 | 3 miles | W | (Sylvania) | |
| 3:0 | At Sylvania stay on the | U223 | 45 miles | NW | (Adrian) | |
| 3:5 | Go onto | Ui27 | 12 miles | W | Jackson | |
| :0 | At Vandercook Lake stay on | U127 | 4 miles | NW | Jackson | |
| :1 | At Jackson stay on the | Ui27 | 3 miles | NW | E Lansing | |
| :1 | Turn left onto | I94 | 29 miles | W | Chicago | |
| :4 | At Marshall stay on the | I94 | 28 miles | W | Chicago | |
| 5:1 | Turn off onto | No name | 4 miles | NW | Kalamazoo | |
| 5:2 | ARRIVE Kalamazoo (Michigan | | | | | |



**RAVENNA ARSENAL, INC.**
8451 STATE ROUTE 5, RAVENNA, OHIO 44266-9297
TELEPHONE: (216) 858-7111 • FAX: (216) 297-3216

February 9, 1993

THRU:   Contracting Officer's Representative
        Ravenna Army Ammunition Plant
        8451 State Route 5
        Ravenna, Ohio  44266-9297

TO:     Mr. Jerry Wade
        Ohio Division of Wildlife
        5795 Melody Lane
        Nashport, Ohio  43830

        Subject:  17 November 1990 Ravenna Army Ammunition Plant (RVAAP)
                  Deer Hunt

        Dear Mr. Wade:

        Provided for your information is page 17 from the 1990 list of
        eligible deer hunters at the RVAAP, and page 2 of 5 of the
        November 17, 1990, Area 2 Deer Hunting Party Roster.  Please note
        that Mr. Thomas Dillon is on both lists.  The Deer Hunting Party
        Roster indicates that Mr. Dillon was in Area 2, subsection 3, and
        that he was in attendance in the morning until sometime after
        12:00 noon, and he tagged a buck.

        Hunters usually arrive at the RVAAP between 5:00 - 5:30 a.m. and
        go through a sign-in and orientation period until approximately
        7:00 a.m.  The hunters are then divided into small groups,
        directed into pick up trucks and placed on stand by volunteer
        Conservation Club Wardens.  The hunters remain on stand
        throughout the day.  The Wardens patrol the area, tag harvested
        deer, and drive successful hunters to their cars.

        The Deer Hunting Party Roster indicates that Mr. Dillon was here
        during the night attendance check (after 12:00 noon), but there
        is no way to tell exactly how long he was at the RVAAP based on
        this roster.  His State Deer Permit number is shown on the
        roster.  The Division of Wildlife should be able to provide
        information on when Mr. Dillon killed his deer based on this
        number.

FEB-16-93 TUE 14:36 MUSK. COUNTY SHERIFF P.02

Should you need more information or have any questions, please
contact Mr. Tim Morgan at (216) 297-3244.

Sincerely,

RAVENNA ARSENAL, INC.

H.R Cooper

H.R. Cooper
Engineering Manager

:TM/bp/DILLON.TM

cc:   N. Wulff   w/o attachment
      T. Morgan  w/  attachment
      File       w/  attachment

DATE: 01/08/91                                      ALL HUNTERS 1991   1990                  PAGE 1
                                                         (2R4)

| HUNT DATE | AREA | RVRAP NO. | HARV | CH/ANS | NAME | ADDRESS CITY/ST/ZIP | SPONSOR |
|---|---|---|---|---|---|---|---|
| 12/08/90 | 2 | 1046 | BUCK | | DeWitt Sr, Dennis | 3715 E. Cleveland Rd Huron, Oh 44839 | State |
| 11/24/90 | 2 | 624 | | CN | Dickerson, Harold | 4710 Woodrow Ave Parma, Oh 44134 | State |
| 12/08/90 | 4 | 1213 | | | Dickey, Larry | 45310 St Rt 154 New Waterford, Oh 44445 | Chandā |
| 12/08/90 | 2 | 1047 | | CN | Dies, Robert | 2259 Boughton Dr Copley, Oh 44320 | Nelson, Ron |
| 12/08/90 | 1 | 919 | | CN | Dietz, Ray | 583 Gwrant St Kent, Oh 44240 | Yocum |
| 11/24/90 | 4 | 815 | BUCK | | Dillon, Doug | 3165 Stroup Rd Rootstown, Oh 44272 | French |
| 11/17/90 | 4 | 414 | BUCK | | Dillon, Doug | 346 Morrison Ave Newton Falls, Oh 44444 | PI |
| 11/17/90 | 2 | 217 | BUCK | | Dilling, Thomas | 2390 Crescondale SE Magnotta, Oh 44643 | State |
| 11/24/90 | 1 | 520 | | | Dilpiazi, James | 1516 W Royalton Rd Apt1 Broadview Hts, Oh 44147 | Navy |
| | 1 | S-04 | | | Dorn, Jim | 600 Jefferson Dr Highland Hts, Oh 44143 | |
| 12/15/90 | 1 | 1319 | | CN | Dchay, Phillip | 597 S Warner Rd Brookfield, Oh 44403 | Air Force |
| 11/17/90 | 1 | 120 | | | Dobbins, Larry | 417 Greenbriar Dr Cortland, Oh 44410 | Slider, Gary |
| 11/24/90 | 3 | S-44 | BUCK | | Dobrilovic, John | 1240 Duck Creek N Jackson, Oh 44451 | |
| 11/24/90 | 3 | 709 | BUCK | | Dobrilovic, John A | 2140 S. Duck Cr N Jackson, Oh 44451 | Dobrilovic, J |
| 11/17/90 | 3 | S-45 | BUCK | | Dobrilovic, Paul | 451 S Diamond St Ravenna, Oh 44266 | |
| 11/24/90 | 2 | 625 | BUCK | | Dobrudisky, Ener | 1699 Jacqueline Dr Parma, Oh 44134 | State |
| 12/08/90 | 4 | 1214 | DOS | | Doering, All | 5138 John Thomas Rd Ravenna, Oh 44266 | McKee |
| 11/17/90 | 3 | S-46 | BUCK | | Doll, Jim | P O Box 40 SR 534 Southington, Oh 44470 | |

SARRV FORM 1006 (R.11/86)

RAVENNA ARMY AMMUNITION PLANT
RAVENNA, OHIO 44266
DEER HUNTING PARTY ROSTER

DATE: 11-17-90　　　　　　　　　　　AREA: 2

| PERMIT NO. | HUNTER'S NAME | DEER PERMIT NUMBER | ATTENDANCE CHECK | | | DEER | |
|---|---|---|---|---|---|---|---|
| | | | MORNING | NOON | NIGHT | BUCK | DOE |
| 1 201 | Anarulis, Kenneth | 199663 | ✓ | | | X | |
| 1 202 | Balog, Joseph E. | 57554 | ✓ | | ✓ | | X |
| 4 203 | Barr, Jane | 525245 | ✓ | | ✓ | | X |
| 204 | Basel, Robert | 76214 | ✓ | | | X | |
| 205 | Bennett, Fallie | | | | | | |
| 1 206 | Bennett, Russel | 164872 | ✓ | | | | X |
| 207 | Bilyz, Alice | | | | | | |
| 1 208 | Booher, Darrell | 301003 | ✓ | | | X | |
| 3 209 | Bramhorst, David | 235331 | ✓ | | ✓ | X | |
| 1 210 | Bruce, Mary Ann | 193309 | ✓ | | | X | |
| 1 211 | Bryan, Ralph | 300761 | ✓ | | | | |
| 2 212 | Buncic, Tom | 200891 | ✓ | | ✓ | | X |
| 2 213 | Crawford, James | 200970 | ✓ | | ✓ | | |
| 1 214 | Cronin, Steve | 18980 | ✓ | | ✓ | | |
| 5 215 | Dearth, Gary | 255602 | ✓ | | ✓ | | |
| 3 216 | DeSalvo, Edward | 196695 | ✓ | | ✓ | | |
| 3 217 | Dillon, Thomas | 181615 | ✓ | | ✓ | X | |
| 3 218 | Dowdy, Alonzo | 539023 | ✓ | | ✓ | X | |
| 3 219 | Dowe, Rich | 145027 | ✓ | | ✓ | | |
| 220 | Emigh, James | 58280 | ACO | | | X | |

APPROVED:

ROBERT J. KASPER
Commander's Representative

KCSD Case #: 90-22452
Detective GWEN ROMANAK
Nature of Complaint: Homicide.
Date Of Occurrence: 11/17/90
Location: Fulton State Game Area

## INTERVIEW WITH HELEN NOFZ:

HELEN NOFZ was contacted at her residence in regard to the photo line up which was conducted with HOWARD SWABASH for Attorney FETTE. Mrs. NOFZ was asked how definite she was in identifying the person that she picked from the four pictures that were shown to her by Mr. SWABASH. HELEN stated, "All I can say is that he looked like him".

She was asked if she positively identified him as being the person in the ditch, she stated, "I can't say that. Not after this amount of time". She was asked if that is what she told Mr. SWABASH, she stated "I told him that of the people that he had there, that looked like the man that was down at the corner, but I don't think I can be sure after this long of a time".

She was again asked to describe what the man looked like. She indicated that he was around 180 pounds. She was then told by Sgt. WERKEMA that the person ID'd to Mr. SWABASH was 135# and he was a small person. Mrs. NOFZ stated he was tall, he was about 5'10. At that time Sgt. WERKEMA indicated that he was 5'10 and 200 pounds and wanted to know if the person in the ditch was approximately his size and stature. She stated that he was approximately the size of Sgt. WERKEMA, not heavy set and was about 30 years old.

Mrs. NOFZ went on to say that she was contacted by her neighbor PAT BOWMAN who called and said someone was in the ditch at the corner, but PAT was not going to go down and help, but wondered if HELEN wanted to. HELEN stated that her and her young son drove down to the corner of 46th and "Y" Avenue where the car was in the ditch.

She stated that the Kalamazoo County Sheriff's Department came to her quite a long time after the shooting of the hunters at the Fulton State Game Area requesting a description of the car. She was thinking it was possibly years after the incident had occurred, but she was not sure. She states the County brought books of cars for her to look at. She was never able to find that car that was in the ditch. She states that she was looking at it with the nose of the car down and the back of the bumper. She does know for sure that it had duct tape over the right turn signal and at that time when Detective WIERSEMA was looking at a man in Ohio for being the murder suspect and she knew that the car was not from Ohio because she states she is from Ohio and if she had seen a license plate being an Ohio car she would have asked the subject where they were from.

Page 2
Interview with Helen Nofz
Romanak

She went on to state that she could not find a picture that matched the description of the vehicle that was down there in the ditch but that it was a hatchback type of vehicle and the back inside of the vehicle was flat. She does not remember anything in the car and just knew it was a bubble type, but she could not find the exact car in the books that she was looking at.

She was asked if the description of the car that she gave back to Detective WIERSEMA would have been more accurate than what she is remembering at this time and she stated that would be more accurate back when she talked to the County Detective originally.

Mrs. NOFZ was then asked if she remembered Detective MOYER from St. Joe County. She indicated she did not remember a Detective MOYER but did remember working with Detective WIERSEMA.

Mrs. NOFZ was then asked if she knew BONNIE HUFFMAN, she stated "Yes", she is the lady that was hunting at the corner and that BONNIE HUFFMAN heard all of what happened and indicated that BONNIE had said she did not see any deer and that was the reason the man said he put his car in the ditch, however BONNIE did not see any deer in the area while she was hunting.

HELEN NOFZ was asked what kind of weather it was, she believes it was a dry day, it was early hunting season and thought it was a clear day.

She was asked about the subject in the ditch's clothing. She remembered him to be sweating profusely. She did not remember any mud on his clothing, however the ditch gets wet because there is a creek that runs through there, but she did not know what the weather had been like previously that day or if it had rained a lot to have mud down in the ditch.

She did indicate that she was there right after this happened and she did remember him having on camouflage.

She was then asked if she knew JEFF TITUS. She states that she has known him since high school. HELEN NOFZ used to share an office with PAUL FREDERICKS who was a good friend of JEFF TITUS and JEFF would come into the office periodically and she did know him when he was in high school.

Page 3
Interview with Helen Nofz
ROMANAK

Mrs. NOFZ asked if she ever talked to JEFF about this incident, she stated "Not really". When she was asked to clarify that, she stated "Not to me, but maybe my husband only about feeling harassed by the police and how he was being questioned and bugged all the time by the police". She was asked what time period JEFF TITUS would have been referring to, she stated probably around 5 years ago, she felt closer back to when this incident happened as opposed to the present time.

She was then advised that the Cold Case Team had not been investigating this case until 1999 until present and after TITUS had originally been talked to, he was never talked to again.

HELEN NOFZ was then again asked of the 4 pictures that she was presented by HOWARD SWABASH to look at, her response to those 4 pictures was the picture she picked out she indicated to HOWARD SWABASH "This looks the most like him" and she once again stated, "It has been too long to tell for sure, but he looks close".

She went on to state that this was the same thing she had said regarding the physical line up in Ohio. She went on to state she had gone to Ohio at the request of Detective WIERSEMA to look at a line-up and that there was a man who looked like the person she saw in the ditch, however this was approximately 2 years after the incident. This person appeared to be a little more heavy set but she told them the same thing, the person that she picked was the person who looked the most like the person she saw in the ditch.

She was again asked if the description was more accurate on this date or back when she originally talked to the police and again back when she originally talked to the police.

She was asked if he wore glasses, she stated "Yes", that he was a white male, 30 years old approximately with gold round glasses, wearing camouflage blaze orange hat, was a little heavy, not skinny.

Mrs. NOFZ was asked about any problems with JEFF TITUS. She stated she had heard people being asked to get off of the property which belonged to the HOLIDAYS which abuts the TITUS property, but she never personally heard him say that to anyone. This is all hearsay and that JEFF TITUS would come down to show her husband deer or elk or moose that he had shot. She indicated he has always been very nice to them and she has never had a problem with him, but she has heard that he has run people off of other peoples property.

Page 4
Interview with Helen Nofz
Romanak


Mrs. NOFZ was asked about the Pick Up Truck that pulled the vehicle out. She stated that she did not stick around to watch them pull the vehicle out. The man driving the Pick Up Truck had dark hair, he was thin, she did not know who he was. He was driving a tall big black jacked up Pick Up Truck, older model, that it appeared to be quite beat up.

She was asked about the description of the front bumper of the vehicle in the ditch that was attached to the sketch that was handed out several years ago as the vehicle looked like the car in the ditch. The print-out indicated that the front bumper had a black finish on the bumper. Mrs. NOFZ states she does not remember that and she was not there when the car was pulled out. She states possibly she had looked down into the ditch to see how stuck this person was, but she does not remember this statement at all.

Getting back to the description of the vehicle in the ditch, she was asked if it could possibly have been a Mustang. She states she is sure it was not a Mustang and it was not so much of a bubble back to it, but more of a hatchback. She stated that her son thought it was a dark silver color, but she doesn't remember it being a dark silver color.

Mrs. NOFZ also stated that she thought the truck that helped pull this person out came from the south which would have been the direction of Leonidas. She thought possibly at the time that the man in the truck knew the guy that was in the ditch, but she did know for sure the guy in the ditch wanted out of there and out of there right now. He was in quiet a hurry.

Mrs. NOFZ was asked if possibly her husband would be willing to speak to us, she stated he probably would, that he currently is substitute teaching but she would speak to him in regards to speaking to the Cold Case Team.

She was also asked if she thought of anything else to please contact the Cold Case Homicide Team with any information that she did have.

Respectfully submitted,
Detective Gwen Romanak
CCCCAT Team

/jdm
5/2/02

KCSD Case #: 90-22452
Detective GWEN ROMANAK
Nature of Complaint: Homicide.
Date Of Occurrence: 11/17/90
Location: Fulton State Game Area

**DATE OF REPORT**: April 30, 2002.

**INTERVIEW WITH BONNIE SHERMAN HUFFMAN**:

BONNIE SHERMAN HUFFMAN, DOB: 5/22/55, ADD: 207 Haynes Street, Vicksburg
MI Tx: 649-1474.  Pager #: 444-1340.

BONNIE SHERMAN HUFFMAN had been contacted in regards to the day the deer
hunters were killed at the Fulton State Game Area.  It was learned through HELEN
NOFZ that BONNIE HUFFMAN had been hunting on the corner of 46th and "Y"
Avenue at the time the deer hunters were killed.

BONNIE SHERMAN HUFFMAN agreed to meet this Detective at the Kalamazoo
County Sheriff's Department on this date.  After meeting with BONNIE in order to get
directions and locations of people correct a small map was drawn of the area of "Y"
Avenue and 46th Street.  BONNIE indicated to this Detective that she was approximately
50 feet east of 46th Street on her parent's property.  That would be at the corner of "Y"
Avenue and 46th on the northeast corner of that intersection.

She indicated that she was in a thicket hunting when she heard a vehicle trying to get out
of a ditch.  She indicated she did not hear the vehicle go into the ditch, but waited for
about 10 to 15 minutes and after hearing it trying to get out she walked from the thicket
over a wire fence to where a vehicle was in the ditch at the corner of 46th and "Y"
Avenue.  BONNIE was asked specifically where this vehicle was at and in which
direction it had been heading.  She states it came south on 46th Street and was
approximately 25 feet north of "Y" Avenue on 46th Street and the rear end part of the
vehicle was in the ditch about 25 feet from the stop sign, northwest of the intersection.

BONNIE states that she climbed over the fence, went up to the subject who was stuck
offering help to push him out.  She described the subject as being very anxious and
nervous and refused any type of assistance from her.  At that point she could tell that the
man was very upset about something and backed off and went back into the thicket and
continued to hunt.

**Page 2**
Interview with Bonnie Sherman Huffman

When BONNIE was asked what time this occurred, she felt it was around 4:00 to 4:30pm. She also was asked to describe the subject who was standing outside of the car that was stuck. She described him as being a male with long light auburn hair, past his shoulders. He was skinny, approximately 5'7. She cannot remember if he was wearing glasses or any clothing that he had on. Her first impression of him was that he was a hunter, but she has nothing to substantiate why she thought that at the time.

She described the vehicle as being a small black vehicle, similar to a Gremlin. She feels the vehicle did have a small trunk to it, but it also had a sloped window and she stated that it definitely had the back end of it into the ditch, not the nose of the vehicle in the ditch.

She was asked if the man appeared to be drunk or intoxicated or under the influence of any type of drugs. She again repeated that he just acted very anxious.

She also described his hair as being greasy looking. She could not tell if it was because he was sweating or if it was just greasy.

BONNIE was asked if the vehicle could have been a Mustang. She states definitely not a Mustang, she knows what Mustangs look like. She just had a feeling that it resembled a Gremlin because her sister had one at one time and felt it was close to that type of vehicle.

BONNIE was then shown a picture of the vehicle that HELEN NOFZ had picked out that most closely resembled the vehicle she had seen in the ditch and BONNIE indicated also that that did look like the vehicle that she had offered to help push out of the ditch.

BONNIE went on to state that after she had been told that her help was not wanted and she went back into the thicket, she did not see anyone else come to help him but there could have been other people, since she did hear other traffic on "Y" Avenue.

She did indicate that when the vehicle did leave the area it went toward Leonidas, which would have been south on 46th Street passing "Y" Avenue. The vehicle was not seen leaving but she could hear it speed away and didn't appear to stop for the stop sign.

BONNIE was asked if she could identify this person again if she saw a picture of him, she stated she did not know, it had been many years, but she would be willing to try if there was a photo line up available to look at. She was advised that contact would be made with her at a later time regarding a photo line up. BONNIE indicated that would be fine.

Page 3
Interview with Bonnie Sherman Huffman

BONNIE was also asked if she had seen any weapons or deer in the vehicle. She stated she had not. She was also asked when she learned of the shootings in the State Game Area. She stated that after it started to get dark she always leaves the woods before dark since she is afraid of the dark. She had climbed the wire fence out onto 46th Street, she unloaded her shotgun which is her normal sequence of doing things when she is out hunting. She then proceeded to walk back to her mother's house on 46th Street.

She states that as she was getting to her mother's house JEFF TITUS was pulling into the driveway in a Pick Up. She stated that he was alone and no one was with him. He went into the house and was there for approximately 30 minutes and had told her and her mother that he had found two dead bodies on his land. She was again asked if he specifically said on his land and that he was the one who found them and she stated that is what he told them, that he himself had found two dead bodies on his land. She also stated that he had been at another neighbor's house prior to coming to her house and she felt this was between 6:15 and 6:30 because that was about the time it was getting dark.

BONNIE was asked if she had ever had any problems with JEFF TITUS. She stated that from the time JEFF TITUS bought the farm from the STRYKERS and some time prior to the death of the two deer hunters, she had had a run-in with JEFF TITUS when she was on her father's property which would have been on the east side of 46th Street in the back. She indicates that there is a large tree that she would go out and sit in and at one time JEFF TITUS came out with a pistol in hand, pointed the pistol at her and told her she was on his property and to get off. She states she did not argue with him, she went back to her house and told her father what had happened and her father told her that he was going to speak with JEFF about the property line that was not JEFF'S property, which she had been on. She didn't know if her father ever made contact with JEFF TITUS or not regarding this incident but she did state it was between the time JEFF bought the property and the deer hunters had been shot.

She also stated that JEFF was very territorial about his property.

In speaking further with BONNIE she was also asked if she remembers hearing any gun shots on the day of the homicide. She states she does specifically remember hearing three shots and thinking to herself that somebody got a deer and a few moments later heard two more shots, but did not know who was doing the shooting.

Page 4
Interview with Bonnie Sherman Huffman

BONNIE was then given a copy of the statement she had given after the deer hunters had been shot. After reading the statement she indicated that that does bring back more memory and that everything in that statement was true. BONNIE was asked what was meant by her not seeing any vehicles or subjects but could only overhear. She states that was true after she had gone out and offered her assistance and the subject refused any help from her and she went back in the thicket, she did not see anyone else help the subject out of the ditch and she did state that the information she had given back at that time would have been clearer in her mind than what she remembers to date, but she was again very specific that she did speak to the subject that was stuck in the ditch, where the car was stuck, how the car was stuck and basically what he looked like, with the long hair being about 135 to 140# and about 5'7 or 5'8.

After this interview was completed BONNIE had made a statement about being careful what you see when you live out in the country. When she was asked to explain what she meant she indicated that in the past they have had people walk through their property walking across to where the HOLIDAY property is, which is on the northwest corner of "Y" and 46th Street and people going back into the State Game Area to tend to their marijuana plants. This statement was out of the blue and not asked of BONNIE.

She further stated that the plants would not be grown in a garden like patch, but sporadically throughout the State Game Area and she herself had personally seen marijuana plants growing in the State Game Area at different times.

BONNIE was then asked if she had ever seen any excavating being done at the TITUS residence. The only thing she knows of was a hole being dug near the barn down near the roadway and didn't know what they were doing with that hole, whether they were burying anything or digging something up and she also stated that JEFF TITUS had been clearing fence lines out. Other than that she did not have any knowledge of any excavating at the TITUS house.

BONNIE was advised she would be re-contacted at a later date and time for a photo line up and possibly for more information. She was asked to continue to think about this incident to see if she could recall anything further.

Respectfully submitted,
Detective Gwen Romanak
CCCCAT Team

/jdm
5/1/02

KCSD Case #: 90-22452
Detective GWEN ROMANAK
Nature of Complaint: Homicide.
Date Of Occurrence: 11/17/90
Location: Fulton State Game Area

**DATE OF INTERVIEW**: May 2, 2002.

**RE-INTERVIEW WITH BONNIE SHERMAN HUFFMAN**:

BONNIE HUFFMAN was re-contacted regarding a photo line-up.  She was presented with a photo line-up of 6 photographs.

Photograph #1 - SCOTT ALAN BOSKER, DOB: 1/1/65.
Photograph #2 - MICKEY LEE SMITH, DOB: 7/26/65.
Photograph #3 - MATTHEW THOMAS GOLDACKER, DOB: 3/16/62.
Photograph #4 - TIMOTHY GRANT MINER, DOB: 12/16/71.
Photograph #5 - CHARLES LAMP.
Photograph #6 - PETER JAMES SNYDER, DOB: 2/6/65.

Prior to showing BONNIE HUFFMAN the photographs she was advised that the person she saw in the ditch on 11/17/90 at 46th and "Y" Avenue may or may not be in the photo line-up.  She was also advised that facial hair along with hairstyles may be different than what she had seen.

At that time BONNIE looked at the photo line-up.  After studying it for several minutes she indicated that the person she saw in the ditch on 11/17/90 was not in this photo line-up.  She indicated that the person she saw had long hair and his chin was narrow with cheekbones that stood out.

BONNIE was then asked if she could remember when she heard 3 shots, then 2 shots, if it was prior to the man in the ditch or after.  She stated that she thought it was maybe 30 minutes before the man went into the ditch is when she heard the gunshots.

She was also asked again about the first time she saw JEFF TITUS on that date.  She states she still remembers walking up the driveway to the sidewalk to go in the back door.  She had not talked to her father yet who was in an outbuilding and she knows her mother was inside and she walked in with JEFF and she states it is definitely between dusk and dark on 11/17/90.

She states that TITUS was alone and never mentioned getting a deer.

She was asked if she ever met STAN DRISKELL before, she indicated she has never seen him in person but did see him on TV after JEFF was arrested.

Page 2
Re-Interview of Bonnie Sherman-Huffman
ROMANAK

BONNIE did state that she did remember the subject she saw in the ditch after the last interview had been wearing a camouflage coat.  She was asked if she noticed any dirt or mud on his person when she asked him if he needed help and she didn't remember anything of that nature.

Respectfully submitted,
Detective Gwen Romanak
CCCCAT Team

/jdm
5/7/02

PAGE:    1                        St. Joseph County Sheriff                RUN TIME-    11:08
                                  INCIDENT REPORT                          RUN DATE- 12/23/90

IIDENT NO.   NATURE OF OFFENSE              INCIDENT LOCATION
8392-90 D    ASSISTANCE OTHER AGENCIES      KALAMAZOO CO

DATE AND TIME OCCURRED            9908             DATE AND TIME REPORTED
                                                  12/??/90        8:20

NARRATIVE:

On the 18th of December of 1990 at approx. 11:54 AM, this officer Larry Moyer and Detective Bruce Wersema of the Kalamazoo County Sheriff's Dept. paid a visit to a lady by the name of Sherrie Bennett, last name now is Waters, maiden name was Bennett.

On that day, we met her at the location of 52150 Fulton Road, Leonidas, Michigan. Both officers talked with Mrs. Waters in concern with some information that had been learned in regards to the killing of James Bennett, who is a brother of Sherrie Waters, and it is claimed that on the night of December 8, 1990, a Saturday night, at approx. 8 PM, Sherrie and a gal by the name of Kim Tracey, Kim Tracey was the girlfriend of James Bennett, both of these ladies went to the County Line Bar in Leonidas and encountered some guy who was at the bar that made the comment that he knew about Jim Bennett being killed and also supposedly stated that he knew who killed Bennett and the other victim in this shooting. Mr. Douglas Estes. Estes being from Comstock, Michigan.

Sherrie stated that she confronted the guy who made the comment and he told her that he was also related to her and was connected to a person by the name of Sandra Bennett. It was also inferred that the person who was shooting his mouth off was a guy by the name of Brian Johnson, who was actually the person supposedly knew Doug Estes and supposedly also knew of a guy who wanted to kill Estes because of some dope deal. According to Sherrie Waters, the only other person that she knew that may have know Johnson's name was a bar maid by the name of Kim Truckey, as she was the person who related the name to Sherrie on that night. Sherrie was further asked about a fellow by the name of Terry Eash, as information had been learned that Eash and Jim Bennett, her brother, had been very close friends. Supposedly, information had also been learned that they may have been in business of some sort together and we needed to talk with Eash. According to Sherrie, she knew Terry Eash, Terry Eash was a pallbearer for the funeral for Jim. She related that his name was not spelled as it sounded, it was spelled something to the effect, Oesch, and that he lived somewhere near Sherwood and also lived with a gal by the name of Kandy Motter. Other than that, she didn't know just exactly all the particulars between Oesch and her brother Jim. She did know that they were friends and they visited frequently back and forth.

Sherrie could not offer any further information in regards to this investigation/followup at this time and date, but asked that officers keep her aware of the circumstances, that she was very concerned about who might have killed her brother. Officers then left the Waters residence.

Also on this date of December 18, 1990 at approx. 2:25 PM, this Officer Moyer went to the address of 118 Mill Street, in the City of Mendon, and met there with an individual by the name of Rodney Kevin

PAGE: 2                          St. Joseph County Sheriff          RUN TIME— 11:0
                                 INCIDENT REPORT                    RUN DATE- 12/26/90

IDENT NO.    NATURE OF OFFENSE                    INCIDENT LOCATION
8392-90 D    ASSISTANCE OTHER AGENCIES           KALAMAZOO CO

DATE AND TIME OCCURRED              9908              DATE AND TIME REPORTED
                                                     12/06/90      8:30

NARRATIVE CONT:

Diffendal, white male, DOB: 8/3/53, 496-7002.  Mr. Diffendal was
questioned about supposedly a party that he held at his residence on
or about November 16, 1990 and he stated he did have one and he, at
that time, was resideing at 703 Pleasant Street in the City of Three
Rivers, in the downstairs apartment of that building.  Mr. Diffendal
related that he invited some people from Weyhauser in Three Rivers and
the party was actually put on by a person by the name of Jerry Blasius
and during the party there was another individual who showed up who's
name was known as Don Buffin, who brought two other guys with him that
were named, first names of Rod and Mark.  Supposedly, these two
fellows were from the area of Kalamazoo or Comstock.  In the interim
of this party, Rod apparently got to talking about the fact that if
anybody needed any hash, that he, Rod, could get it from a person by
the name of Terry Oesch, and he could get any amount.  Also, later,
the next day as it was learned, Diffendal stated that these two
people by the name of Rod and Mark had, in fact, been carrying guns
while they were at that party that night, handguns of some sort.  He
did not know much about these guys, as they were brought with Buffin,
who came to the party.  According to Diffendal, this Rod got into a
fight with somebody in the kitchen during the party.  Didn't even
know what it was ever, but at some time, short time thereafter, Rod
and Mark apparently left the residence.  According to Diffendal, he
did not know that Estes was related or connected to Jim Bennett.
According to Diffendal, he did know Bennett, himself.  He has known
him for several years and probably only saw him about two times in the
last five years.  And he believed that the last time that he actually
saw Jim Bennett was approx. around Christmas time of 1989.  Diffendal
was asked about any particular activities of drugs that Bennett was
involved in, and according to Diffendal, he knew that it was
supposedly common knowledge, that everybody knew, that Jim at least
used marijuana and also growed it someplace, but he did not know
exactly where.  Diffendal advised that he could not offer any further
than what had already been commented to, but that if he heard anything
further, he would be sure and get ahold of this officer.  The inter-
view lasted approx. 20 minutes.

     On the date of December 19, 1990 at approx. 1:15 PM, Detective
Moyer and also Acting Detective James Bedell from the Michigan State
Police Post went to a location in Mendon, a business called T & H
Plastics, where a gal by the name of Kandy Kay Motter, white female,
DOB: 8/22/56, who resides at 922 Blossom Road, Sherwood, MI, 741-5831.
Kandy works for T & H Plastics during the day hours and was questioned
about some facts of her live-in boyfriend, who's name she related
was Terry Todd Oesch.  He's a white male, she alledged that his DOB
was 7/24/56.  She claims that he is presently laid-off from his job,
in which he usually works for a company out of Elkhart, hauling RV
vehicles around, recreational vehicles.

PAGE:   3                       St. Joseph County Sherif.          RUN TIME-    11:0
                                INCIDENT REPORT                     RUN DATE- 12/26/9

CIDENT NO.   NATURE OF OFFENSE                    INCIDENT LOCATION
8392-90 D   ASSISTANCE OTHER AGENCIES            KALAMAZOO CO

DATE AND TIME OCCURRED                990            DATE AND TIME REPORTED
                                                        12/06/90      8:30

NARRATIVE CONT:

        While the interview continued, officers inquired as to any
vehicles that Terry owned or drove. She stated that there was an 81
Mercury, red in color, that he drives. He also owns a Suzuki 750
motorcycle, black in color, with a fairing around the front. Kandy
was asked about her relationship with Jim Bennett or Terry's relation-
ship with Jim Bennett. She stated that they all three were good
friends, they've known each other for years. She grew up in the area
of where Jim lived. She was asked when she last recalled seeing Jim
Bennett, prior to his death, which was on the 17th of November.
According to Kandy Motter, she stated that she believed that it was
on a Wednesday, November 14th, 1990, she and a lady named Mary, who
she could not relate the last name, were in the Village of Colon, MI
and went into the Curly's Bar and she encountered Jim Bennett, his
father, and the brothers of Jim Bennett, who were Terry and Fred. She
stated that while they were in there, that they were commenting about
going hunting the next day, so that's how she knew for sure that it
was the 14th of November. The time that she was in there was between
5 and 6 PM. They talked about hunting the next day, but did not make
comments as to where they were going hunting. Officers asked Kandy if
her boyfriend or live-in, Terry Oesch, had ever hunted with Jim
Bennett and she thought that he had on time to time. Officers wanted
to know what type of weapons he might have, if any. She stated that
she knew he had a .22 rifle and believed a shotgun of some sort. She
was asked what she could tell about Jim Bennett as far as his behavior
or what kind of a person he was and she related, well Jim was just a
little hard to get to know, but he was generally a pretty good person
to know and he was a very smart person. Kandy was asked about anybody
that might own a dark blue vehicle with a hatchback or a black vehicle
with a hatchback, whereas the taillight was busted out and possibly
duck tape over the taillight. She stated she didn't know anything
about that, but she works with a gal, who she claimed was a Lori
McCue, had talked to her about this, where a vehicle had been seen in
and around the area of where the location of the shooting took place.
That supposedly got stuck and accordingly Lori knew who this person
was that pulled that vehicle out of the ditch. Officers asked where
Lori was. Kandy stated that Lori works there at T & H Plastic also,
and that she would also be talking with her soon after officers were
through and then we could interview with Lori. Kandy was asked if she
knew of any other girlfriends that Jim Bennett may have gone with or
known, and she stated that there was a girl approx. a couple three
years ago from the White Pigeon area who goes by the name of Bonnie.
She did not know her last name. But, other than that, she did not
know anyone besides this gal he was living with by the name of Kim.
        Officers asked that Kandy please let Terry Oesch know that
officers would like to talk with him about this, because of the fact
that he was suppose to have been a very good friend of James Bennett.
This interview lasted approx. 1/2 hour.

PAGE:   4                    St. Joseph County Sheriff          RUN TIME-   11:08
                             INCIDENT REPORT                    RUN DATE- 12/26/9

CIDENT NO.   NATURE OF OFFENSE                  INCIDENT LOCATION
  8392-90 D  ASSISTANCE OTHER AGENCIES          KALAMAZOO CO

DATE AND TIME OCCURRED              9908            DATE AND TIME REPORTED
                                                   12/06/90      8:30

NARRATIVE CONT:


     At approx. 1:45 PM on December 19, 1990 officers also interviewed
a lady by the name of Lori Ann McCue, white female, DOB: 11/29/64,
4311 6 Mile Road, Athens, MI, 729-9006. Lori was asked about the fact
that she may have told Kandy about this alledged vehicle that was to
have been stuck down on Y Avenue in Kalamazoo County on the evening of
November 17, 1990 and supposedly somebody attempted to pull that
vehicle out and supposedly she knew who the person was driving the
pickup truck that pulled this vehicle from the ditch. According to
Lori, she did not know the person who pulled the vehicle out, and the
only way she learned of this information was through her nephew, her
nephew being a Steve Casselman, 14 year old, white male, H Drive,
East Leroy, MI. According to Lori, Steve was at a girlfriend's house
by the name of Becky Bowman, 16 years of age, Y Avenue, Kalamazoo Co,
and on that night of November 17, 1990, Steve was at this girlfriend's
house, supposedly, and some lady came to the door of the Bowman
residence and asked if Becky's father was there, as there was a
vehicle down the road in the ditch. According to Lori, all she heard
was that possibly a dark 4-wheel drive pickup had pulled the car out
of the ditch. She could not offer any further to officers in regards
to either the vehicle that was in the ditch, or the vehicle that
pulled the vehicle from the ditch. However, according to Lori, Becky
Bowman's parents own the carpet shop located in Athens, MI and they
may be able to enlighten officers further in respect to that incident
or situation on the night of November 17th.

     On December 20, 1990 at 12:35 PM, the investigating officer,
Detective Larry Moyer went to the carpet shop located on M-66 in
Athens, MI and met with a lady by the name of Patricia Bowman.
Patricia advised her husband's name is Ronald and that they both live
at the address of 16020 Y Avenue, Fulton, MI, 729-5408. According to
Mrs. Bowman, on the night of November 17, 1990, after she got off of
work, she went to East Leroy, where she picked up Steve Casselman from
his home and drove him to her home to be with her daughter, Becky
Bowman. Also, accordingly, Mrs. Bowman advised that there was nobody
else at home with Becky when this alledged person, female, come to the
door of the Bowman residence and advised that there was a car in the
ditch. As a matter of fact, Becky was the only one that was
confronted with her father being home and whether or not there was
help that could help this vehicle get out of the ditch. Accordingly,
Mrs. Bowman didn't even know about this situation until approx. 10 PM
on the night of the 17th, as her daughter had not related it right
away. According to Mrs. Bowman, a neighbor lady by the name of Ellen
Nofz had called about 10 PM, wanting to know what was going on. And
then, of course, Becky also told mom what had happened in regard to
this lady coming to the door and said a guy was in the ditch by the
corner and wanted to know if her father was home to help the guy out.

```
PAGE:   5              St. Joseph County Sheriff          RUN TIME-   11:0[
                          INCIDENT REPORT                  RUN DATE- 12/26/9[

  IDENT NO.   NATURE OF OFFENSE            INCIDENT LOCATION
 '8392-90 D   ASSISTANCE OTHER AGENCIES   KALAMAZOO CO

 DATE AND TIME OCCURRED            9908        DATE AND TIME REPORTED
                                              12/06/90     8:30
```

NARRATIVE CONT:

And Becky said, no, but she would call a neighbor and see if they could help.  And Becky called Helen Nofz and at that point, all she knows is that Mrs. Nofz went to the area of where the person was in the ditch in offering of assistance and that was basically all Mrs. Bowman could relate.  Mrs. Bowman further stated that her daughter, Becky was attending school at the Athens School, that she would have no objections if this officer wanted to go interview with her daughter at the school.  She called the school and made the arrangements and cleared for this officer to talk with her daughter.

At 1:50 PM on this date of December 20, 1990, Detective Moyer did arrive at the school and also began to interview with a young female by the name of Rebecca Lynn Bowman, white female, DOB: 11/20/73, 16020 Y Avenue, Fulton, MI.  She alledged that she is the daughter of the lady that was just talked with, Patricia Bowman.

Becky was asked about the night of November 17, 1990, if she could recall that evening.  She stated, yes, she was home alone on that afternoon at approx. 4:50 PM, a vehicle drove into the driveway, it was a dark blue, full size, 2-door vehicle, possibly a 85 or 86 model, and a lady, a white female, who had been in the vehicle alone, drove in the driveway and got out of the vehicle and walked to the door and knocked on the door.  And the lady, when Becky answered the door, asked if her dad was home and Becky told her no.  The lady said a car was in the ditch at the four corners, which would have been at the corner of Y Avenue and 46th Street.  The lady advised that she did not want to stop, so she just drove right directly to the house to see if someone could help the person get it out, as there was a guy wandering around the car.  Becky said she would call a neighbor and see if they could help.  At that point, Becky claims she called Helen Nofz and asked if Dave was home, who is Mrs. Nofz' husband.  She stated no and Becky told Helen what the lady had said, and Helen said she would go see.  At that point, when Becky turned around, the lady had left and was backing out of the driveway and then drove back into the driveway and asked if somebody was going to help and Becky told her yes.  Becky advised that the lady was a white female in about her 30's, approx. 5'8, medium built with dark brown curly hair, past her shoulders.  She stated that the lady was wearing blue jeans and a dark blue, navy colored, hooded sweatshirt with a zipper front.  Other than that, she did not know the lady and had never seen her before, that she recalls.

According to Becky, Mrs. Nofz called back approx. 5:30 to 6 PM and said somebody had already been at the car that was in the ditch and was helping them get it out.  That a pickup truck was pulling the vehicle from the ditch.  That was the extent of what Becky claimed to know about that particular night until it had come out that there had, in fact, been a shooting.  Then some time later then, this vehicle was mentioned amoungst the family and Mrs. Nofz as possibly being

PAGE:   6                          St. Joseph County Sheriff          RUN TIME-    11:0
                                      INCIDENT REPORT                  RUN DATE- 12/26/90

IDENT NO.    NATURE OF OFFENSE                    INCIDENT LOCATION
8392-90 D   ASSISTANCE OTHER AGENCIES            KALAMAZOO CO

DATE AND TIME OCCURRED                    5908              DATE AND TIME REPORTED
                                                            12/06/90        8:30

NARRATIVE CONT:

involved or having some connection to that possible shooting.  Becky
was asked which way the vehicle left the lady was in, when it left
her home.  She stated that it went west on Y Avenue and that was the
end of her seeing either the car or the lady.

        Also on this date of December 20, 1990, Moyer talked with a lady
by the name of Helen Emily Nofz, who resides at the address of 15962
Y Avenue, Fulton, MI, DOB:  6/6/47, 729-5134.  Mrs. Nofz made the
comment that she believed the call to her home from Becky was approx.
5 PM.  That stated that a lady had come to the house and was asking
for assistance for a car in the ditch down at the 4-way corners at
Y Avenue and 46th Street.  Mrs. Nofz was asked if Dave was home, her
husband, which she told Becky no.  But that she, Mrs. Nofz, would go
down and see if she could offer some assistance.  Mrs. Nofz stated
that she and her 9 year old son, Derrick, got in her vehicle and drove
down to the location of where a car sat in the ditch.  According to
Mrs. Nofz, the vehicle that was in the ditch was, in fact, a small
black car, hatchback style, 2-door, with the right rear taillight
broken out and duct tape over the taillight, itself.  The taillight
was not a new style vehicle, as it didn't wrap around the side of the
vehicle.  She stated the front bumper was of a rough finish, kind of
ruffely and was black in color, as well.  She could not determine the
exact make of the vehicle.  She was asked about the individual who may
have been with the vehicle that was in the ditch.  Mrs. Nofz stated
that it was a white male, approx. 30 years of age, wore glasses, was
stocky built, had mixed type clothing on, which was sort of hunting
clothing, as she stated that part of the clothing was sort of
camouflage and he had an orange knit type cap on, like a stocking cap.
She stated when she arrived at the corner, this fellow was sweating
very profusely and made a couple comments to the fact that the car
wasn't his, that it was his wife's, but he had a brother or brother-
in-law who does body work and he could get the body worked on and at
that point, pointed in the direction to the south, as if pointing
towards the area of Leonidas.  Mrs. Nofz was asked about the year of
the vehicle, she stated that she wasn't sure, but believed it was
probably 85 model or a little newer.  She did, however, state that her
son, Derrick, thought it was a Dodge vehicle and told her that it was
a bluish to black color.  Mrs. Nofz also stated that this driver or
the individual with the car made a comment that a deer had ran in
front of him.  She believed that he was driving from the east toward
the west, from his indications.  However, she talked to a lady by the
name of Burnsworth, who stated that Burnsworth believed she saw this
vehicle going south bound on 46th Street from the north of Y Avenue
prior to it going into the ditch.  Also, Mrs. Nofz made the comment
that she had never seen any deer cross specifically at that intersec-
tion and thought it was odd that this vehicle would have ended up in
the ditch in that location from a deer crossing.

PAGE: 7                         St. Joseph County Sheriff            RUN TIME-     11:08
                                   INCIDENT REPORT                   RUN DATE- 12/26/90

IDENT NO.    NATURE OF OFFENSE                    INCIDENT LOCATION
8392-90 D    ASSISTANCE OTHER AGENCIES           KALAMAZOO CO

DATE AND TIME OCCURRED                    9908          DATE AND TIME REPORTED
                                                          12/06/90        8:30

NARRATIVE CONT:

Mrs. Nofz was asked if she thought she might be able to do a composite drawing of the individual, or also be able to identify the vehicle from a vehicle identification book, if one was furnished for her to look at. She stated that she would, and Moyer advised that Moyer would have to return to Centreville and pick up a I-Dent-A Kit to do a composite and also a copy of the motor vehicle identification book and would return to her residence at approx. 4:30 PM that evening

At approx. 4:35 that same evening, Moyer did, in fact, return to the Nofz residence where Moyer was met by Helen Nofz, her husband David Nofz and a 9 year old son by the name of Derrick Nofz. A composite was begun on the information received from Mrs. Nofz and took approx. 1 hour and 15 minutes to complete. And, again, the same description was given as to the white male, approx. 5'10" to 5'11", medium to stocky build, in his 30's, with a stocking type hat that was blaze orange in color, that had a brown fold area at the bottom of the hat, and the man had glasses on which were that of wire rim glasses. After a completion was done, Mrs. Nofz stated to the procedure of doing the composite, that the man's face, everything was pretty much exact, except for the man's face, up in the cheek bone area was a little wider and she was asked to draw that in by using that of a grease marking pencil to extend the thickness of the face of that area, which she did. When completed, she stated that the composite looked at least 90% to the likeness of the individual that she believes she saw. Also, after going through the motor vehicle identification booklet, Mrs. Nofz picked out a vehicle that was very similar and this was a 1987 Dodge Shadow, however, she stated that she thought the windows sloped a little more and it did not have that much of a trunk. However, the taillight also did not wrap around the side, as shown in the photograph, but other than that the style was pretty close. Mrs. Nofz stated that the interior of the vehicle was a tan color and the vehicle had Michigan Plates on it. She was asked to describe the taillights that she recalled seeing on the vehicle. She stated they were sort of an oblong and indicated by her hands as showing size wise, she indicated that they were approx. 10 inches long and also approx. 3 1/2 to 4 inches wide or high in that dimension. Mrs. Nofz stated that if she saw either vehicle, that vehicle, or the other vehicle that pulled that car out, she would definitely call this officer or Kalamazoo County Sheriff's Dept. and relate to them what she had observed.

She stated that the truck that pulled the vehicle from the ditch was a black pickup truck which had large tires, was sort of a beat up truck, with no cap, was a 4-wheel drive. The man in the vehicle, she recalled, as being a white male, approx. in his 30's. The man had a beard, she wasn't sure, she didn't take that close a look at the man. However, she did think that she had known that man in the pickup truck from someplace. Probably in and around the Athens area.

After the vehicle was pulled from the ditch, Mrs. Nofz stated

PAGE:   8                          St. Joseph County Sheriff         RUN TIME-    11:08
                                   INCIDENT REPORT                   RUN DATE- 12/26/9

IDENT NO.   NATURE OF OFFENSE                    INCIDENT LOCATION
8392-90 D   ASSISTANCE OTHER AGENCIES            KALAMAZOO CO

DATE AND TIME OCCURRED                  9908            DATE AND TIME REPORTED
                                                        12/06/90      8:30

NARRATIVE CONT:

that the truck went north on 46th Street and then the car went south
on 46th Street.  However, she had not seen either, and did not know
either vehicle before that, neither did she know either of the men by
names.  However, if she spots either of the vehicles, she will jot
down a license number or get any information possible for officers.
     The interview and the composite will be completed at this time.

REPORTING OFFICER _____        DATE ____/____/____

COMMANDING OFFICER _____ DET/SGT LAWRENCE MOYER _____   DATE ____/____/____



Dennis LaBelle
Prosecuting Attorney
**Grand Traverse County**
324 COURT STREET, P.O. Box 552
TRAVERSE CITY, MICHIGAN 49685-0552 • (616) 922-4600

1-23-93

BRUCE,

    I ran across this article in the local paper today. I figured you are probably aware of this, but I'm just making sure.

    I hope things are going well.

For the most part this Northern Michigan life is agreeing with me. I miss some of the intensity of my old job, but there are enough challenges here for me.

    Drop me a line sometime.

Brian

are leaving behind. The average deti... service was a career capper for them... simply is not going to appen, com efit for... Code of work el... DEM KM me said... "Another 25 percent will step Filler and that a he up VAC of the right ployees is $173 a week for about 18 back" to previous positions. now."

# Is a serial killer putting outdoorsmen in his gunsights?

COLUMBUS, Ohio (AP) — Gloria Jean Paxton says she doesn't hate the serial killer authorities believe is responsible for the death of her son and at least three other outdoorsmen in the secluded, rolling hills of eastern Ohio.

But she has open scorn for whoever shot her 21-year-old son, Jamie, as he hunted deer on a hillside on Nov. 10, 1990.

"If I ever meet him, I will tell him he has the blood of a lot of men on his hands and no matter how many times he washes his hands, that blood will still be there," she said.

Paxton also expressed her feelings in letters posted at the site of her son's death and published in The (Martins Ferry) Times-Leader. A year after the killing, the eastern Ohio newspaper received a letter from a person who claimed to be Paxton's killer.

"Jamie Paxton was a complete stranger to me," the letter said. "The motive for the murder was this — the murder itself."

The letter gave details that authorities used to link the apparently random shootings of at least four men who were hunting, fishing or jogging alone between April 1989 and April 1992.

The Noble County prosecutor's office said evidence was presented to a grand jury this week. Authorities planned a Friday news conference about the case.

A prime suspect emerged after agents trailed a man they said might his weekends drinking beer, cruising remote roads and shooting at utility poles and road signs and killing more than 1,000 animals, including cats, dogs and cattle.

Federal agents arrested the man, Thomas Lee Dillon, a 42-

year-old Canton water department draftsman, on Nov. 27 on unrelated firearms charges. He has not been charged in the slayings and denies involvement, according to his attorney, Roger Synenberg.

The lawyer would not discuss the case further, saying, "There have been enough rumors and innuendoes already."

Investigators said earlier that they had no witnesses, they didn't think the killer knew his victims, and there was nothing to indicate the victims ever met each other.

"These people were just there when the shooter decided to shoot," said Dave Hanna, senior agent at the FBI's Columbus office and member of a joint federal, state and local task force investigating the slayings. "There is no apparent motive — not robbery or revenge."

Hanna said additional deaths could have been overlooked as hunting accidents. He said investigators are looking at two deaths in lower Michigan in 1990 and one in northeastern Indiana in 1991 as well as two in northeastern Ohio in 1980 and 1983.

The only deaths that have been linked so far are four in eastern Ohio. The victims were Paxton, of Bannock, killed while hunting near St. Clairsville; Donald Welling, 35, of Strasburg, killed while jogging near New Philadelphia on April 1, 1989; Claude Hawkins, 49, of Mansfield, killed while fishing in Coshocton County on March 14, and Gary Bradley, 44, of Williamstown, W.Va., killed while fishing near Caldwell on April 5.

All were shot on a weekend with a high-powered rifle, most likely from a nearby roadway, investigators said.



Thomas Lee Dillon: Arrested Nov. 27 on unrelated firearms charges. He has not been charged in the slayings and denies involvement.

A fifth death in eastern Ohio also may have been the work of the same person. Kevin Loring, 30, of Duxbury, Mass., was killed while hunting in Muskingum County on Nov. 28, 1990 — a Wednesday. The bullet that shattered his skull was never found.

According to court documents, Dillon's fellow employees said he boasted of killing dogs and cats, earning him the nickname "Killer."

Dillon also told an informant that "it would be easy to shoot someone," and that slayings in several different counties would cause jurisdictional problems for investigators, according to court documents.

With physical evidence lacking, the FBI's National Center for the Analysis of Violent Crime created a profile of the killer's likely characteristics.

Dane Shryock, a lead task force investigator, testified at Dillon's firearms hearing that the killer probably is a white man over age 30. He said the killer probably has above-average intelligence but doesn't handle personal conflict and stress well.

# Study shows high exposure to tobacco smoke

ATLANTA (AP) — Scientists conducting a large federal study of exposure to tobacco smoke were surprised to find signs of nicotine in all 800 of the first people tested, whether they smoked or not.

smokers among the 800.

The CDC seldom releases such preliminary data but did so on Thursday because it wanted Americans to know it was working to answer questions the EPA report raised. Pirkle said the study, which started in 1988,

ends next year.

Study participants are also being given questionnaires that will help pinpoint how nonsmokers with cotinine levels were exposed, such as by smoking spouses, co-workers or smoke-filled rooms.

Scientist

WASHINGTON (...sive rivers of vapor, ing as much water azon — have been id the lower atmospher Reginald E. New Massachusetts T Technology, said was surprised to fi while analyzing sa His findings are Geophysical Resea published by the Geophysical Union. A half-dozen v carry water from toward the poles narrow streams, plained in a tele view.

"I expected to se lowing air masses, have much large widths. The fact th centrated was a su said Newell. The like a river," he sai The general und the atmosphere h warm moist air ris gion of the equat moves toward the curving somewhat the twist imparted ning of the earth. The newly disco do follow these ciples, but move th narrow streams having it spread ou air mass.

They seem to ge toward the poles plained, though he couple of cases stream encounter "gets entangled goes back equator The rivers also in their moveme though why this i not clear...

Great

# Sniper Sought in Murders of 8 Sportsmen, 2 in Michigan

Someone is killing sportsmen in Michigan, Ohio, and Indiana. Between April 1989 and April 1992, eight sportsmen were slain by a sniper while alone in remote areas, according to the *Cleveland Plain Dealer* and other published reports.

Putting People First, an organization opposed to the tactics of "animal-rights" and environmental extremists, has learned from a source with detailed information about the case that investigators now feel that three hunters killed in Michigan and Indiana were slain by the same person believed to be responsible for the deaths of five sportsmen in eastern Ohio. All the victims were shot from long distance with a high-powered rifle. Police assessments indicate that one person was responsible for all the slayings.

Among the eight victims, five were hunters, two were fishermen, and one was a nature walker. Five of the slayings occurred in Ohio near Wheeling, West Virginia; two in Michigan's Kalamazoo County; and one in Stueben County in northeastern Indiana.

"We want to catch this guy badly," said Deputy Director Dennis Lipley of the Stueben County Sheriff's Department.

The FBI, law enforcement agencies from five counties, and the Ohio Department of Natural Resources have formed a task force to investigate the murders and have asked for the public's help—particularly from hunters and anglers.

Investigators have considered animal rights and antihunting extremism as a possible motivation for the murders. Although they have not found any link yet, they have not ruled out a connection.

Radical animal-rights groups, such as the Rocky Mountain Humane Society, have advocated hunter harassment such as shooting in the vicinity of hunters in order to stop hunts and to scare off game.

The book "A Declaration of War: Killing People To Save Animals and the Environment," written by "Screaming Wolf" and sold by Good Shepherd Foundation, recommends actually shooting hunters.

In England, Bernard Levin quoted a leader of the Hunt Retribution Squad, a fanatic antihunting group, in the *London Times* as saying that antihunters will escalate their harassment of hunters to a point "where the next stage then would be to actually take a hunter out completely."

On May 8, a Canadian Greenpeace activist was arrested for shooting at a bear hunter near Red Earth, Alberta. Graham Hood was charged with assault with a deadly weapon. After being questioned, Hood said he did not want people hunting bear in that area.

Putting People First urges hunters to remain calm and not overreact. The danger of serious injury is hard to overestimate, and any overreaction will give the animal-rights activists the ammunition they are looking for. Any suspicious persons or behavior in hunting areas should be reported to local law enforcement authorities.

—*People's Bulletin*

**Report All Poaching Hotline**
**1-800-292-7800**



This person was seen in the area of Y ave and 46th St. Kalamazoo County, Wakeshama Twp. On Nov.17,1990 at about 5:00 Pm, was stuck in the ditch at the intersection, he is described a being a White Male about 30 Years of age, about 5-10 to 5-11, stocky built, had on mixed clothing, blue jeans, Camoflage jacket or sweat shirt, a Blaze Orange Stocking Cap, with a Dark Brown bottom edge, the whole fold was brown.

Subject was wearing Wire rimmed Glasses, and Made the comment that the vehicle was his wife's car, and also stated that he had a brother or Brother in law that did body work and the

damages could be repaired by this relative, and pointed toward the south, as if the relative lived in St. Joseph County.

Subject drove South on 46th St. from the scene of where he had gone into the ditch.

Composite done by Det/Sgt L. Moyer, St. Joseph County Sheriff Dept Reference Complaint 8392-90 Any Information, Contact Det. Wersema,Kalamazoo County Sheriff Dept, or Larry Moyer.



## 1987 DODGE SHADOW

This Vehicle is described as being close Resemblance to the vehicle seen with the man in the Composite, of Complaint 8392-90, and in the area of Y Ave and 46th St. Kalamazoo County, on Nov 17,1990, shortly after a Double Shooting had Occured on the State owned Property North of Y Ave. This vehicle or Person may or may not be involved, Investigator's would like to talk with the driver of this vehicle.

The vehicle is close but not exact.    the Rear sloped and had a Short Trunk area, and had the right rear Tail light Broken and was taped with Duct Tape, Front bumper was a rough black finnish.

Any information, contact Kalamazoo County Sheriff Dept. Det. Bruce Weresma,    or Det/Sgt Larry Moyer St. Joseph County Sheriff Dept.

# **APPENDIX D**

Coshocton County (Ohio) Reports Re Thomas Dillon

1993, Turned Over Via FOIA, June 2020

# THE UNIVERSITY OF MICHIGAN
## LAW SCHOOL
# MICHIGAN INNOCENCE CLINIC

701 S. State St.
Ann Arbor, MI 48109-1215
(734) 763-9353
FAX (734) 764-8242

## FAX TRANSMITTAL SHEET

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME: _Coshocton County Sheriff's Office_

COMPANY NAME: _____

FAX NUMBER: _740.622.4487_

PHONE NUMBER: _____

****************************

FROM: _Adam Bean - MIC_

DATE: _6/26/2020_

TOTAL PAGES (including this page): _6_

Message: _Please See request attached._

If transmission is incomplete for any reason, please call (734) 763-9353. Reply to fax number (734) 764-8242

THIS FACSIMILE IS CONFIDENTIAL AND PRIVILEGED. If you receive this document in error, please notify us immediately by telephone and discard the original. Thank you.

STATEMENT OF
CRAIG A. CASEY, DEPUTY SHERIFF
COSHOCTON COUNTY, OHIO

On February 9th, 1993 at approximately 15:30 hours a
Physical Line Up was conducted at the Coshocton County Sheriff's
Department, 328 Chestnut Street, Coshocton, Ohio.

The following is the unscaled sketch of the viewing area
with exact line up positions and approximate position of others:



SECTION OF COSHOCTON COUNTY JAIL

The following are a list of Viewers and Witnesses to
this line up:

A.  Mr. Bruce Wiersema  – Kalamazoo County, Michigan Sheriff's
Department.

B.  Mr. Terry Baxter   – Coshocton County resident and lawyer
being used as unbiased council to
the proceedings.

C.   Mr. Roger Synenberg — Legal council for Mr. Thomas Dillon.

D.   Mr. Harry Trombitas — FBI Agent, Columbus, Ohio Office.

E.   Mr. Kenneth Koch       — Deputy Sheriff, Coshocton County,
                              Ohio.

F.   Mr. Lucian Young       — Prosecuting Attorney, Noble County,
                              Ohio.

G.   Mr. Langdon Smith      — Sheriff, Noble County, Ohio.

H.   Mr. Craig Casey        — Deputy Sheriff, Coshocton County,
                              Ohio.

I.   Mrs. Helen Nofz        — Viewer of line up; resident of
                              Michigan — Age 45.

J.   Mr. Derek Nofz         — Viewer of line up; resident of
                              Michigan — Age 11 and son of Mrs.
                              Helen Nofz.

K.   Mr. Nofz               — Resident of Michigan and husband
                              and father of (I) and (J).

     The following is the list of the six (6) white male
participants used in the line up:

(Furthest right     POSITION #1 — Mr. Barry Ackerman
 as viewed)                      HGT: 5-9    WHT: 160   AGE: 42

                    POSITION #2 — Mr. Louie Durbin
                                 HGT: 5-10   WHT: 170   AGE: 46

                    POSITION #3 — Mr. Thomas Dillon
                                 SSN: 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        AGE: 42

                    POSITION #4 — Mr. William Bumpus
                                 HGT: 6-0    WHT: 175   AGE: 43

                    POSITION #5 — Mr. Gary Atkinson
                                 HGT: 5-9    WHT: 165   AGE: 46

(Furthest left      POSITION #6 — Mr. Steve Wilson
 as viewed)                      HGT: 5-9    WHT: 195   AGE: 33

**NOTE:**  ALL PHYSICAL DESCRIPTIONS ARE APPROXIMATES AS GIVEN
           BY PARTICIPANTS.

Prior to the actual line up all involved were briefed in the proceeding that would be used. The viewers had been isolated and never saw any line up participant prior to the line up. The line up participants were arranged in line and viewed by this writer, Mr. Baxter, and Mr. Wiersema for any reason to disqualify, change positions, clothing, etc. Mr. Synenberg was also present. Line up participants were then instructed by this writer what was expected to be performed by them.

At this point all involved took their positions. The line up participants were led into line up room by this writer and put into position. Mr. Koch then took Polaroid, 35 mm, and videotape pictures in all positions line up would be in.

At this point viewing now took place. Viewers looked through a glass window, approximately 16"x16" from the adjoining room as different positions (frontal, right, left) were instructed to line up by Mr. Koch. Line up turned as a whole with no one doing anything individually.

Mrs. Nofz viewed first. When completed she wrote a number on a piece of paper and folded it. She made no comment to anyone as was previously instructed. Mr. Derek Nofz viewed next and was accompanied by his father. When completed he wrote a number on paper and folded it. There was also no comment by Derek Nofz.

At this point Mr. Synenberg and Mr. Baxter were given the opportunity to view the line up, which they did.

At this point the line up was concluded. All participants were released and Room B was cleared while Mr. Wiersema then conducted an interview with Mr. & Mrs. Nofz and son Derek as to the results of the line up.

CRAIG A. CASEY, DEPUTY SHERIFF
COSHOCTON COUNTY SHERIFF'S DEPARTMENT
FEBRUARY 9, 1993

# **APPENDIX E**

FBI Lineup Report

February 1993

ORIGINAL

-1-

70A-CI-60437
HWT:las

      The following investigation was conducted by SA HARRY
W. TROMBITAS, Columbus Resident Agency, Cincinnati Division:

      On February 9, 1993, SA TROMBITAS traveled to Noble
County, Ohio, to attend the arraignment of THOMAS LEE DILLON at
the Noble County Courthouse, Caldwell, Ohio.  SA TROMBITAS met
with several members of the Task Force investigating captioned
case before the arraignment.  SA TROMBITAS also provided
assistance at the Courthouse in maintaining control of the many
spectators and media representatives that were present.  SA
TROMBITAS also coordinated the arrival at the Courthouse of
victims family members as well as their departure.

      DILLON arrived in Caldwell, Ohio and was taken to the
Noble County Sheriff's Office and placed in a holding cell until
the arraignment.  When DILLON observed SA TROMBITAS, he advised
he wished to speak with SA TROMBITAS alone.  DILLON was advised
he would have to clear such a meeting through his attorney, ROGER
SYNENBERG.  SA TROMBITAS advised prosecutor, LUCIEN YOUNG, III,
of DILLON'S request and YOUNG advised he would also make contact
with DILLON'S attorney to see if the meeting would be possible.

      DILLON was arraigned at approximately 1:00 P.M. and a
trial date of April 13, 1993 was set.  A cash bond was set at one
million dollars.  DILLON was returned to the Noble County
Sheriff's Office upon completion of the arraignment after which
time he was to be transported to Coshocton County to appear in a
line-up.  As DILLON was leaving the Noble County Sheriff's
Office, he again requested to speak with SA TROMBITAS.  DILLON
was advised the meeting could possibly take place in Coshocton
County.

      Detective BRUCE WERSEMA, Kalamazoo, Michigan Sheriff's
Office, was present at Coshocton County to run the line-up.  Also
present was a family from Kalamazoo, Michigan who claimed to have
seen an individual stuck in a ditch approximately one half mile
from where two hunters were killed in Kalamazoo, Michigan.
Detective WERSEMA requested the line-up to see if the witnesses
could identify DILLON.

70A-CI-60437-101

−2−

70A−CI−60437

A fair line-up was conducted in the presence of DILLON'S attorney, ROGER SYNENBERG.  Upon the completion of the line-up it was learned both witnesses positively identified DILLON as the individual they saw at the vehicle stuck in the ditch.

After the line-up was conducted, attorney ROGER SYNENBERG approached SA TROMBITAS and advised that his client, THOMAS DILLON, wished to speak with SA TROMBITAS alone.  SA TROMBITAS advised attorney SYNENBERG, that he was willing to talk with DILLON but wanted to make sure SYNENBERG understood DILLON approached SA TROMBITAS first.  Attorney SYNENBERG advised he understood and had no problems with SA TROMBITAS talking with DILLON.  SA TROMBITAS met with DILLON for approximately 20 minuets in an interview room at the Coshocton County Sheriff's Office (see FD-302).

After the interview, DILLON was transported by Coshocton County Deputies back to Lake County Jail in Lake County, Ohio.  SA TROMBITAS then briefed several members of the Task Force as to the results of the interview with DILLON.

# **APPENDIX F**

KCPO FOIA Response Re Thomas Dillon

July 9, 2020

FFR: 070920



### KALAMAZOO COUNTY PROSECUTING ATTORNEY
*Response to Request for Public Records Pursuant to*
*Freedom of Information Act*

Requestor's Name and Address:
Mr. Adam Bean
Michigan Innocence Clinic
701 S. State Street
Ann Arbor, MI  48109
ajbean@umich.edu

Replied by:        Email         Mail        Other:

Date Request sent:  6/16/2020
Date Request received:  6/18/2020 (w/ 10-day extension)—amended/ clarified via email on 7/6/2020

Documents/Records Requested:
Original Request: "police reports, progress notes, witness/suspect statement, sketches, and all other disclosable documents which mention, either directly or indirectly, Thomas Dillon or Thomas Lee Dillion in relation to" the Fulton State Game Area homicide on November 17, 1990
Amended/Clarification: "We are not requesting that you read through every single sheet of paper, rather, we are requesting that you see if you have a file somewhere in those boxes about Thomas Dillon as it pertains to the FGA killings."

  Approved

        Portions exempt from disclosure (see comment section for further explanation)

  Approved—Further Action Required

        Non-exempt documents will be provided upon receipt of check or money order made payable to "*Kalamazoo County Treasurer*" in the amount of $ _____.

        A good faith deposit is required.  Your Request for Public Record will be processed upon receipt of check or money order made payable to

*"Kalamazoo County Treasurer"* in the amount of $         .   Note: Additional payment will be required before documents are released.

Please send payment to: FOIA Coordinator
Office of the Prosecuting Attorney
227 W. Michigan Avenue
Kalamazoo, MI  49007

See enclosed Itemized Cost Worksheet for a summary of costs.

See comment section for more information

Denied

Record exempt from disclosure

Record not sufficiently described—If possible, please provide further detail

Record does not exist as described; Record not maintained by this Office; Record destroyed/purged pursuant to retention policy

As an inmate, you are not eligible to receive public records

See comment section for more information

COMMENTS:
Our *Jeff Titus* felony file contains no sub-file regarding a Thomas Dillon, nor any group of documents bearing that name.  In preparation for trial, the trial prosecutor meticulously indexed the entire police report.  That index contained no reference to a Thomas Dillon.  For clarification, I did not search page by page, but instead looked only at the trial prosecutor's index and each separate folder and envelop within the file at large.  If you desire a more thorough search of any portion of the file, please submit that request separately.

Notice of Rights

If your request has been denied in whole or in part, you may do one of the following:

(1)     Submit to the FOIA Coordinator a written appeal that specifically states the word "appeal" and identifies the reason(s) for the reversal

of the denial. Your appeal should be sent to the Kalamazoo County Prosecutor's Office, 227 West Michigan Avenue, Kalamazoo, Michigan 49007.

(2)    Commence an action in the Circuit Court to compel disclosure of the public records within 180 days after the Prosecutor's final determination to deny your request. If the Circuit Court orders disclosure of all or a portion of the public record, you have the right to receive reasonable attorney's fees, costs and disbursements, and possibly punitive damages.

You may also submit an appeal to the Prosecuting Attorney if you believe the fee(s) requested exceed the amount permitted by law.  This appeal must be in writing and specifically identified as an "Appeal of Fees."  If the prosecutor fails to respond or otherwise denies the appeal, you may commence an action in the Kalamazoo County Circuit Court within 45 days.

See MCL 15.231 *et seq.* for further information on the Freedom of Information Act, and/or visit www.kalcounty.com/opa for access to forms and detailed information concerning our FOIA policy and procedures.

I certify that the documents/records provided in response to this request are true and accurate copies.

I certify that *pursuant to a cursory search*, the documents/ records requested do *not* exist or are no longer maintained by the Office of the Prosecuting Attorney.

Signature:    *Heather S. Bergmann*          Date:    07/09/2020
                   FOIA Coordinator or Designee



☆ **OPA_FOIA**  📎                                                                1:33 PM   O

RE: Michigan Innocence Clinic FOIA Request, Follow Up

To:  Adam Bean

🗑  ↩  ↩  →  📎 1 ⌄

Mr. Bean,
   The response to your request is attached.  No records were found.

Heather Bergmann

See More from Adam Bean

Confidentiality: The information contained in this electronic mail message and any attachments is intended only for the use of the individual or entity to which it is addressed and may contain legally privileged, confidential information or work product. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution, or forwarding of the E-mail message is strictly prohibited. If you have received this message in error, please notify me by E-mail reply, and delete the original message from your system.

FFR 070920
(Jeff Titus).docx

# **APPENDIX G**

Undisclosed Podcast, Episode 11, Transcript (Excerpt)

February 1, 2021

**Undisclosed: The State v. Jeff Titus**
**Episode 11: White Rabbit**
**February 1, 2021**

**Detective Wiersema:**
All police can, if they want to, steer witnesses. They can get information, from experience and training, that the person may not want to give up. It all comes with experience and training. I on one hand say the facts are the facts, and that's what I go by. Some others maybe embellish things a little bit to make it go their way because it's important for them, to them. It's important, but not enough to… I'd rather see ten guilty people go free, than one innocent person go to prison or jail. That's the way I feel about it. And that's it.

**[01:03] Colin Miller:** You've probably noticed that there are a number of witnesses in this case whose stories have changed over time. Witnesses who said one thing to begin with, only to say another thing by the time of Jeff Titus's trial.

These changes haven't been random, though. There's a pattern there.

Take Rich Adams, for example. He told the original detectives that a man had threatened him in the game area, not far from where two deer hunters were shot and killed -- but after seeing a picture of Jeff Titus, Rich Adams said the man who'd threatened him was *not* Titus, it had been someone else. Then, eleven years later, the cold case team tracked down Rich Adams and interviewed him again -- and by the time the cold case team was done, Rich Adams was saying that the man who threatened him *had* in fact been Jeff Titus.

Or take Jeff Titus's coworker, Michelle. In 1994, she told a VA investigator that Titus had mentioned that someone had been killed behind his farm, but he hadn't said much about it, beyond the fact he'd been investigated and cleared as a suspect. Six years later, though, the cold case team tracked down Michelle and interviewed her again -- and by the time the cold case team was done, Michelle was saying that Jeff Titus had confessed to finding two bodies on his property, and to having taken one of the victim's guns with him.

This happens again and again in the case file. A witness has one story, but then they talk to the cold case, and now they have another story instead.

Werkema had given Baldwin's ex-girlfriend copies of her prior statements, to help her remember while on the stand everything she'd told the cold case team before. And after the trial, this star witness had received something else from Werkema too.

As described in the Kalamazoo Gazette article, in a section Vendeville had marked with yellow highlighter:

> "As for the reward money [Baldwin's ex-girlfriend] received, Werkema said police submitted her name for reward money from Silent Observer and that she received the funds after the case against Baldwin had been adjudicated. Werkema said the woman was completely unaware of the reward until she received it."

Like in the Baldwin case, a Silent Observer reward had also been offered in Jeff Titus's case. In fact, the cold case team had widely advertised this reward at Titus's former workplaces, in order to encourage his former coworkers to come forward with information about Titus. They had also advertised it around Fulton.

But in Titus's case, we don't know who the reward money ultimately went to. That still remains a mystery today.

~~~~~

**[48:34] Susan Simpson:** I haven't been able to speak to Detective Werkema myself, but cold case Detective Mike Brown has always been willing to share his thoughts on the investigation. So I'd asked him about Bonnie's story, and what he thought of it.

> **Susan Simpson:**
> And I do have a lot of questions about Bonnie Huffman.
>
> **Detective Mike Brown:**
> Oh, yeah.
>
> **Susan Simpson:**
> What do you think happened there?
>
> **Detective Mike Brown:**
> Well, I didn't, I never talked to her to be honest with you. I didn't talk to her so, who was it that talked to her?
>
> **Susan Simpson:**

Werkema.

**Detective Mike Brown:**
Yeah, there you go. I didn't talk to her.

Even Detective Mike Brown, who has always been the most enthusiastic advocate of Jeff Titus's guilt, does not place any significance on the changing stories of Bonnie Huffman. He didn't talk to her, and he'd had no part in it. And since he knows nothing about it, he's not going to make any effort to defend what was done to obtain her testimony in the first place.

**Susan Simpson:**
It doesn't sound like you put much, you're that concerned with Bonnie Huffman, are you?

**Detective Brown:**
No.

**Susan Simpson:**
It wasn't her that you think puts him at the crime scene.

**Detective Brown:**
I'm not concerned with Bonnie. I'm not concerned with a guy in a ditch. I'm not concerned with any of that. None of that.

**[49:45] Susan Simpson:** But even if Mike Brown isn't concerned about Bonnie Huffman, the jury at Jeff Titus's trial had been. She was the only evidence that connected Jeff Titus to the crime scene. All other eyewitness evidence says he wasn't there.

My best chance at figuring out why Bonnie Huffman's story had changed was to talk to her. So, late last year, I talked to her on two separate occasions.

The first time, Jacinda and I had gone together, but that interview was not recorded. About a month later, I decided I needed to try again; it was too important not to. I went back to talk to Bonnie, and she'd agreed to a recorded interview.

Unfortunately, Bonnie's dogs had been super excited about being on a podcast. They barked. A lot. I've never tried harder in my life to make friends with a dog, but it didn't work.

But while attempting to interview her, I'd asked Bonnie the most important question I had: when Jeff Titus had come by that night, to tell them about the murders in the Fulton Game Area, what time had it been?

> **Susan Simpson:**
> So, did he come by… when did he come by?

> **Bonnie Huffman:**
> Uh, that night? The night that he did that? I'm gonna say it was around… 8 o'clock?

> **Susan Simpson:**
> So you weren't living there, but you'd gone home that day?

> **Bonnie Huffman:**
> I was [unintelligible] … [talking to barking dogs] Enough is enough.

8pm, Bonnie told me. That's the same answer she'd given Detective Wiersema 30 years ago, in 1990, when he'd first asked her the same question.

It was also the same answer that Bonnie had given Jacinda and I before, when we'd talked to her the first time a few weeks earlier.

> **Susan Simpson:**
> Ok, she was very clear that it was that night.

> **Jacinda Davis:**
> She did say that it was dark.

> **Susan Simpson:**
> She said it several times.

[51:28] If you ask Bonnie Huffman, today, when Jeff came by, she will tell you she is certain it was very late that evening, well after dark. And that brought me to the second most important question I had for her: Why then, had Bonnie given a different answer, when she had been testifying at Jeff Titus's trial?

Bonnie said she didn't remember much about the trial at all, she said. In fact, she told me, she only had one clear memory of what happened in the courtroom that day:

**Susan Simpson:**
Do you remember at trial when you testified?

**Bonnie Huffman:**
All I remember is a blue shirt and a blue tie.

**Susan Simpson:**
Nice tie?

**Bonnie Huffman:**
Nice tie.

**Susan Simpson:**
What did he say about that? Did he, uh…

**Bonnie Huffman:**
Oh, I told him he had a beautiful tie.

**Susan Simpson:**
So he just said, "thanks?"

**Bonnie Huffman:**
Yeah.

**Susan Simpson:**
Yeah.

Bonnie remembers that Jeff Titus had on a beautiful blue tie, and that she'd complimented him on it. Although she'd known it probably wasn't proper for her to be speaking to the defendant directly.

**Bonnie Huffman:**
I know, I've never forgot that. It was such a nice tie.

Even after talking to Bonnie, I still do not know why her story changed. Was the story she told at trial a false memory that, in the 20 years since, she's now forgotten that she ever remembered in the first place? It's possible, I think. Or is there something more going on here to explain it all?

# **APPENDIX H**

FBI Notes of Interview of Mike Chappell

May 7, 1993

5-7-97

MILAN    FEDERAL PRISON

MIKE R. CHAPPELL        DOB  4-19-61      SSN  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

LAKE   COUNTY   NARCOTICS   UNIT.    1300 PLANTS      97 MONTHS

NEXT   TUESDAY   AIR FORCE BASE   IN   N. CAROLINA.

ARRESTED
AUG 31   92     INTO LAKE COUNTY,   BEDFORD   HEIGHTS.
                        LAKE
OCT/NOV    TO   COUNTY

INTO   FIGHT   PUT   IN   ISOLATION   RANGE   WITH   DILLON.

DILLON - WROTE NOTES   IN BOOKS   RELIGIOUS   STUFF

INTRODUCED SELF   AS   GUY ACCUSED OF   SHOOTING HUNTERS,   WAS

KIND   OF PROUD OF IT.

THERE FOR   10   DAYS   IN   RANGE   W/DILLON.

TALKED   EVERY   DAY.   —   NEVER DENIED KILLINGS — SAID " THEY

CAN'T PROVE IT." (MURDER) OR ARSON)

TOLD ABOUT SHOOTING COW WITH CROSSBOW B.ET.   SAID CARS

WEREN'T CLOSE ENOUGH TO HEAR.   SHOT METER AND SIGN W/25.

WHO CARES ABOUT COWS.   BRAGGED ABOUT SHOOTING TWO DOGS

AT PUMP W/AR-15.   SAW PICTURES OF C-32.

SHOT GUYS 30 YDS APART, GOT ONE IN CHEST.

SAID CAN'T PROVE HE WAS EVEN IN COUNTY

GUYS HEAD SHOT OF/DILLON LAUGHED BECAUSE DON'T KNOW

SHOTGUN OR RIFLE   USED.

SAID ONE GUY WAS FACTORY WORKER - BIG DEAL.

D. — SAID GUY BOUGHT GUN   WAS HIS AGE.

D- SAID GUN WAS

CAN FILE /17 MOTIONS TO BANKRUPT COURT. PLANS ON THIS.

HAS BOOK DEAL SIGNED ALREADY.

D- WANTS TO KILL NEIGHBOR.

D. - KNOWS WHO TURNED HIM IN.

D- KNEW FRY HAD A TAPE RECORDER.

D- BIG DEAL ADIUT WHO WAS KILLED - JUST FACTORY
WORKER.

D- SAID NOTHING TO WORRY ABOUT BECAUSE OTHER GUNS
NOT RECOVERED.

D- OWNED OVER 400 GUNS.

D- ==TALKING DISTANCE WHEN HE SAID GUY SHOT IN
CHEST. DILLON MOTIONED TO HIS CHEST. SAID
" DOWN SOUTH ".==

D- ==BEING BLAMED FOR 11, DOESN'T KNOW WHERE SOME OF
THEM ARE.==

D. - TOLD ABOUT DEAD CAT PICTURE W/ WIFE.

D. - LAUGHING ABOUT KILLING PEOPLE - LIKED IT.

D. - SAID HIS MISTAKE SELLING GUN. " I NEVER
WOULD HAVE GOT CAUGHT."

D- SAID NOTHING ABOUT OTHER WEAPONS - HE IS NOT
WORRIED ABOUT THEM.

D. - SAID SHOULD HAVE JUST SOLD 6.5 AND NOT
BOUGHT ANOTHER GUN.


HE WANTS TO TELL YOU BUT HE CAN'T.

D- S.VICKERLA ABOUT LETTER SAYING BASICALLY HE WAS
CRYING FOR HELP. TOM SAID " WHY WOULD I DO THAT "

D- BOOKS - HOW TO BE YOUR OWN BEST FRIEND.
WROTE RELIGIOUS STUFF IN THESE BOOKS.

D. - BASON SAID FOUND A MAP & LAUGHED ABOUT
IT. SAID 120 HOUSES ON MAP & ABOUT
1/2 OF THEM WERE BURNT. SAID HE WAS DRIVING
AROUND LOOKING FOR LAND. TALKED ABOUT STRIP
MINE.

D - PUMP & SHOOT RATS WHEN HE WAS A KID.

D - DID NOT TALK MUCH ABOUT ARSONS BUT BASICALLY
LAUGHED ABOUT IT.

LIKED BEING REFERRED TO AS SERIAL KILLER.

D. SAID UNITS DID NOT SEE HIM DRINKING.

D - DOES NOT WANT HIS WIFE TO LIE FOR HIM
BY SAYING HE WAS HOME.

D - DEFENSE IS TO RUN COUNTY OUT OF MONEY
AND NO ONE SAW HIM.

D - IS STANDING FIRM ON NOT TAKING A DEAL.

D - SAID HE WOULD COPE DEAL IF HE COULD
SPEND FEDERAL TIME.

D - LAWYER STARTED HIM ON BREAKING COUNTY.

D - BOOK DEAL SHE IS CONSULTANT AND GETS
MONEY, COUNT CAN'T TOUCH IT.

D - MONEY COMING FROM RETIREMENT BEING PUT INTO
TRUST FUND FOR JOHN. NEITHER CAN BE TOUCHED
BY COURT.

D. SAID NO ONE SAW HIM, CAN'T EVEN PROVE
HE WAS IN THOSE COUNTIES.

RON BAKEMAN USA DEA.
LETTER MAILED 6-8 WKS AGO TO RON ABOUT THIS.

D- KNOWS HE WILL NOT GET OFF. EVEN SAYS
EVIDENCE IS OVERWHELMING.

NEVER DENIED — SHOOTING ANIMALS — SHOOTING GUY
IN CHEST.

HAS FRIEND AT AKRON BEACON JOURNAL THAT TIPS
HIM OFF.
CALLS WIFE
WRITES ALOT.
UNKNOWN VISITOR.

MADE THREATS TO CHOKE COUPLE GUYS

NO SORROW FOR THIS.

" BIG DEAL JUST FACTORY WORKER"

D- THOUSANDS OF YARDS OF FLAT, BILLON WOULD HAVE
SEEN HIM
D- MENTIONED THAT HE WAS ACCUSED OF UGLY OLD CONVERSATIONS

# **APPENDIX I**

"Killer in Question" Documentary Transcript (Excerpt)

2020

**KILLER IN QUESTION**
**EPISODE 102 TITUS**
**THE HUNTED PART 2**
**PAGE 1 OF 41**

| 01:00:01 | | **GRAPHICS ON SCREEN**<br>*Producer: You don't know*<br>*anything about the serial killers?* |
| --- | --- | --- |
| 01:00:01 | Female Producer VO | You don't know anything about the serial killers? |
| | | |
| 01:00:02 | | **GRAPHICS ON SCREEN**<br>*Michael Brown*<br>*Cold Case Detective* |
| | | |
| 01:00:03 | Michael Brown OC | Nope.  Fill me in. |
| | | |
| 01:00:25 | Michael Brown VO/OC | Yeah, that's interesting.  But see, I never saw those.  I never, I never heard about the story of the serial killer.  Yeah.  But you know what?  There's a lot of amazing things in this world. |
| | | |
| 01:00:38 | | **GRAPHICS ON SCREEN**<br>*The Cold Case Team Didn't Know*<br>*Thomas Dillon Had Been Looked At*<br>*For the Murders Until Our Interview.* |
| | | |
| 01:00:44 | Mike Werkema OC | That's extremely…<br><br>**GRAPHICS ON SCREEN**<br>*Mike Werkema*<br>*Cold Case Detective*<br><br>…coincidental.  But these are the kinds of things that happen in investigations, and now these are some of the obstacles that we have to overcome to, to get a conviction. |
| | | |
| 01:00:54 | Michael Brown OC | We got the guy that's guilty. |
| | | |
| 01:01:01 | | **GRAPHICS ON SCREEN**<br>*Producer: I think you have a*<br>*little reasonable doubt creeping in.* |
| | | |
| 01:01:01 | Female Producer VO | I think you have a little reasonable doubt creeping in. |
| | | |

**KILLER IN QUESTION**
**EPISODE 102 TITUS**
**THE HUNTED PART 2**
**PAGE 37 OF 41**

| | | |
|---|---|---|
| | | he, you know, yelled to them and talked to them. You know, "How you doing?" this and that.  And then he said he just shot them.  You know? |
| | | |
| 01:38:02 | Michael Brown OC | No.  No way in hell. |
| | | |
| 01:38:05 | | **GRAPHICS ON SCREEN**<br>*Producer: Do you find any similarities to the Titus murder in that statement?* |
| | | |
| 01:38:05 | Male Producer VO | Do you find any similarities to the Titus murder in that statement? |
| | | |
| 01:38:08 | Michael Brown OC | No. |
| | | |
| 01:38:09 | Male Producer VO | No? |
| | | |
| 01:38:12 | | **GRAPHICS ON SCREEN**<br>*Mike Chappell, The Former Inmate*<br>*Who Served Time With Dillon, Was Also Shown*<br>*The Composite Sketch Of The Man Whose Car*<br>*Went Into The Ditch.* |
| | | |
| 01:38:22 | Female Producer VO | So the witnesses who saw him helped prepare a composite image of the guy in the ditch and… |
| | | |
| 01:38:27 | Mike Chappell VO | Who did they draw?  Oh, wow. |
| | | |
| 01:38:30 | Female Producer VO | Does that look familiar to you? |
| | | |
| 01:38:31 | Mike Chappell VO | Yeah.  Huh. |
| | | |
| 01:38:32 | Female Producer VO | Who is that? |
| | | |
| 01:38:32 | Mike Chappell VO | That's Tom, huh?  That's Tom.  Wow. |
| | | |
| 01:38:40 | | **GRAPHICS ON SCREEN**<br>*Producer: So, his response*<br>*when he says wow, to me…* |
| | | |
| 01:38:40 | Male Producer VO | So his response when he says, "Wow," to me, that sounds… |

# **<u>APPENDIX J</u>**

Kalamazoo County Cold Case Team Press Release

May 30, 2000

# NEWS RELEASE

**DATE:** 5/30/00

**DEPARTMENT/DIVISION:**   Kalamazoo County Cold Case Homicide Team

**ADDRESS:** 215 W. Lovell

**CONTACT PERSON:**  Assistant Chief Dan Weston    **PHONE:** 337-8123

## INVESTIGATION OF TEN YEAR OLD DOUBLE HOMICIDE

James Bennett and Douglas Estes were shot in the back at close range on November 17, 1990. Their bodies were found approximately 15 feet apart in the 16000 block of East X Avenue near Fulton, MI. They were dressed for and appeared to be deer hunting in the area. Their bodies were found late in the afternoon. The Cold Case Homicide Team needs the community's help to solve this case.

Earlier in the day on November 17, 1990, there were two hunters in the Fulton game area field dressing a deer. These hunters briefly spoke with other hunters in the area and commented about observations they had made that day. The Cold Case Team needs to speak with any and all hunters that were in the Fulton game area during deer hunting season of 1990 and more particularly on November 17, 1990. The Cold Case Team is asking for everyone who was in the area of the Fulton game area on November 17, 1990, come forward and contact us. We are also asking for any citizens who have heard or know about persons that were in the game area on or about November 17 to contact the Cold Case Team. Oftentimes witnesses feel that their knowledge is so trivial that it is not important and could not have value to solving the case. Nothing could be further from the truth. The Cold Case Team needs to speak with everyone that

has any knowledge of persons in the game area on or about November 17, 1990.

The Cold Case Criminal Apprehension Team was implemented in September of 1998 to focus on the investigation of inactive unsolved homicides within the County of Kalamazoo. The Team is comprised of seasoned detectives from the Kalamazoo County Sheriff's Department, the Portage Police Department, and the Kalamazoo Department of Public Safety. Since the inception of the program, the Cold Case Team has closed by arrest the 1994 homicide of Kristine Smith of Portage, MI; the 1982 murder/robbery of Jimmy Lindstrom at the Cork Screw Party Store in Kalamazoo, MI; the 1988 shooting death of Austin Garrett, the 1980 beating death of Cornell Smith in Kalamazoo, MI; and the murder of Cheryl Hurd which occurred in September of 1975.

Reward money up to $5,000 may be available for information leading to an arrest. The Cold Case Homicide Team can be reached at 616/337-8155.

###

# **APPENDIX K**

Composite Sketch of Man in Ditch, November 1990

Photo of Thomas Dillon, 1993



# **APPENDIX L**

1980's Gray Chevy Cavalier



# **<u>APPENDIX M</u>**

Harry Trombitas FBI Report

July 1993

FD-302 (Rev. 3-10-82)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription _____7/7/93_____

      THOMAS LEE DILLON, date of birth July 9, 1950, SSAN 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, was interviewed at the Noble County Sheriff's Office/Jail in the presence of his two attorneys, DAVID DOUGHTON and ROGER SYNENBERG. Those conducting the interview were, Sheriff LANDON T. SMITH, Noble County Sheriff's Office, Captain DANE R. SHRYOCK, Coshocton County Sheriff's Office, and Special Agent HARRY W. TROMBITAS, Federal Bureau of Investigation (FBI), Columbus Resident Agency, Cincinnati Division. This interview took place on the second floor of the Noble County Sheriff's Office and was video taped. The interview commenced at 9:38 a.m. DILLON provided the following information:

      DILLON was asked to detail the events surrounding the homicide of DONALD WELLING in Tuscarawas County on Saturday, April 1, 1989:

      DILLON advised he left his residence, 2390 Crescent Dale Southeast, Magnolia, Ohio, at approximately 7:00 a.m., driving his 1988 gray CHEVROLET Cavalier. DILLON left his residence with the intention to go target shooting in Tuscarawas County. DILLON stated he had not been drinking beer or alcohol on this morning. After target shooting, DILLON indicated he was on his way home and remembers driving on County Road 94 and was headed east bound approximately one mile west of Strasberg. DILLON stated he had in his vehicle a 7.65 Argentine Mauser rifle. As DILLON was driving along the roadway he observed an unknown white male walking along the road, all of a sudden DILLON indicated he "heard a voice" that said "Do it, do it" and he pulled up along side of the white male, stuck his rifle through the driver's side window towards the unknown white male and fired a single shot striking the unknown male through the arm and into the chest. DILLON observed the unknown male immediately drop to the ground and believes he was dead almost immediately. DILLON

Investigation on ___7/2/93___ at _Caldwell, Ohio_  File # _70A-CI-60437-145_

by _SA HARRY W. TROMBITAS:las_  Date dictated _7/5/93_

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 11-15-83)

70A-CI-60437

Continuation of FD-302 of ___THOMAS LEE DILLON_____, On __7/2/93__, Page ___2___

estimated that the time of the shooting was approximately 9:25 a.m. and he remembers the unknown male had a jacket and a hat on at the time he was shot. DILLON then drove away from the area and headed directly home where he took the rifle inside his house, cleaned it and put it away. DILLON remembers reading the newspaper the following day, Sunday, April 2, 1989, and saw the headline detailing the homicide of DONALD WELLING and DILLON said to himself "You did that." DILLON stated approximately two weeks later he threw the rifle into the Sandy Creek River in Tuscarawas County. DILLON remembers he purchased the rifle at a gun show, possibly in Columbus, Ohio, approximately two years before the homicide. DILLON also indicated he has been back to the murder site on several occasions.

DILLON then gave details concerning the homicide of JAMIE PAXTON on Saturday, November 10, 1990:

DILLON advised he left home before daylight and intended to go deer hunting with his cross-bow. DILLON purchased beer at a DAIRY MART in Carolton, Ohio, and began to drive around hoping to find a deer along the roadway. DILLON entered Belmont County sometime between 8:15 a.m. and 8:30 a.m. and remembers traveling on State Route 149 and State Route 9 into a strip mining area. As DILLON drove his vehicle slowly along the roadway he remembers coming upon a beige colored CHEVROLET that was parked along the right side of the road. DILLON then observed an unknown white male up on a slight hill all by himself. DILLON then claimed to hear a voice that said "Do it, do it." DILLON then parked his vehicle along the roadway, got out with a .308 bolt action Spanish mauser rifle and aimed it at the unknown male. DILLON indicated the unknown male began walking back towards the roadway and was approximately 100 feet from DILLON when he pulled the trigger, striking the unknown male in the chest. The unknown male immediately dropped to the ground. DILLON slid the bolt of the rifle back and removed the casing and put it in his pocket. DILLON then pushed another round into the rifle and fired a second shot striking the unknown male in the knee area. DILLON again slid the bolt action back,

FD-302a (Rev. 11-15-83)

70A-CI-60437

Continuation of FD-302 of   THOMAS LEE DILLON _____, On __7/2/93__, Page ___3___

removed the casing, placed the casing into his pocket, put
another round into the chamber and fired a third shot striking
the unknown male in the backside.  After the third shot, DILLON
returned to his vehicle, which he stated was a blue colored, 1986
TOYOTA pickup truck and departed for his residence.  DILLON
advised he sold the rifle at a gun show in Medina approximately
one month later.  DILLON began to follow the accounts of the
homicide in the TIMES LEADER newspaper and learned the name of
the victim was JAMIE PAXTON and also found out PAXTON was younger
than DILLON had originally thought.  DILLON claimed the fact
PAXTON was so young bothered him and he felt bad.  DILLON began
subscribing to the Belmont County Newspaper, the TIMES LEADER
approximately two weeks after the homicide so he could follow the
accounts of the homicide.  Approximately one year after the
PAXTON homicide, DILLON decided to write an anonymous letter to
the TIMES LEADER and detail the homicide.  Sometime earlier,
DILLON received a manual ROYAL Elite typewriter from his brother,
JACK DILLON, and DILLON laid on his bed at home and typed the
letter to THE TIMES LEADER.  DILLON indicated the poem he
referenced in the letter he typed was from a book he kept at his
office at the CANTON WATER WORKS entitled something to the effect
"AMERICAS 100 FAVORITE POEMS," and in particular, CHRISTINA
ROSSETTI'S poem, "Remember."  Once finished with the letter
DILLON handled the letter wearing gloves and used a damp sponge
to seal the envelope and affix the stamp so investigators could
not get fingerprints or do DNA analysis, implicating DILLON.
DILLON remembers selling the gun at a gun show in Medina
approximately one month later for approximately $60.00.  DILLON
also admitted returning to the PAXTON grave site on numerous
occasions.  DILLON indicated on September 6, 1992, he rode his
motorcycle to the PAXTON crime scene and kicked over a cross that
was placed in the ground by the family marking the location where
PAXTON died.  DILLON indicated he later threw the typewriter he
used to type the letter to THE TIMES LEADER into the Sandy Creek
River near where he tossed the rifle used to kill DONALD WELLING.
DILLON stated that the individual that the FBI had video taped
showing up at the grave site on the anniversary date of PAXTON'S

FD-302a (Rev. 11-15-83)

70A–CI–60437

Continuation of FD-302 of ___THOMAS LEE DILLON_____ , On __7/2/93___ , Page __4__

     murder was definitely not him.

        DILLON then gave the details of the KEVIN LORING homicide on Wednesday, November 28, 1990:

        DILLON left his residence early in the morning and traveled on Route 39 into New Philadelphia where he purchased beer.  After driving around for a period of time, DILLON remembers being on Prospect Church Road just west of Adamsville and saw an unknown white male hunting, dressed completely in orange.  Again, DILLON indicated something told him to "Do it" and he parked his blue TOYOTA pick up truck along the roadway. DILLON then removed a 6.5 times 55 Swedish mauser rifle from his truck and walked approximately 50 yards into the brush and waited for the unknown male to approach.  When the unknown male was approximately 75 feet from him, DILLON raised his rifle and aiming for the head fired a single shot.  DILLON stated the bullet struck the victim in the center of the forehead and caused the cap the unknown male was wearing to fly 20 feet into the air. DILLON immediately knew he killed the individual.  DILLON estimated the time to be approximately 2:15 p.m.  After DILLON shot the victim, he returned to his truck and drove away.  DILLON indicated he sold the Swedish mauser at a gun show for approximately $75.00 sometime later.  Approximately one and a half years after the LORING homicide, DILLON and his wife, CATHY, went on a vacation in the New England area.  DILLON stopped at a library in Plymouth, Massachusetts, and looked up the date of the homicide in the local newspaper which was on microfilm just to find out more about the victim.

        DILLON then detailed the homicide of CLAUDE HAWKINS on March 14, 1992:

        DILLON advised he left his residence early in the morning and drove to the DAIRY MART located in Bolivar, Ohio, where he purchased some GENESE beer.  DILLON advised he then began driving around in the Coshocton County area and in particular, the Wills Creek Dam area.  As DILLON proceeded over

FD-302a (Rev. 11-15-83)

70A-CI-60437

Continuation of FD-302 of ___THOMAS LEE DILLON_____ , On __7/2/93__ , Page ___5___

the dam he looked down to his right and saw a lone, unknown male
fishing in the Wills Creek River.  DILLON continued around on the
roadway and observed the unknown male's vehicle which he
described as a BUICK parked along the roadway.  DILLON parked his
vehicle, a red TOYOTA pickup truck, behind the unknown male's
vehicle.  DILLON removed a 6.5 times 55 Swedish mauser rifle from
the cab of his pickup truck and walked approximately 50 yards
from the roadway toward the unknown male.  When DILLON was
approximately 75 feet from the unknown male, he fired a single
shot striking the unknown male in the back.  DILLON stated the
unknown male immediately dropped to the ground and DILLON knew he
was dead.  DILLON returned to his vehicle and departed towards
his residence.  Once DILLON arrived home he remembers cleaning
the gun and putting it away.  DILLON followed the accounts of the
homicide in the newspaper and went back to the crime scene
sometime in August, 1992.  DILLON stated the fact the victim,
CLAUDE HAWKINS, was a black man made no difference to him and
would have shot a woman as well.  DILLON estimated the time he
shot HAWKINS was approximately 10:30 a.m., and remembers the
weather was cold, cloudy with some snow on the ground.  DILLON
advised all of his victims were random and they were just in the
"wrong place at the wrong time."

        At 10:37 a.m., all participants took a break.

        At 10:52 a.m., all participants returned to the
interview room and the interview was continued.

        DILLON then detailed the homicide of GARY BRADLEY that
occurred on Sunday, April 5, 1992:

        DILLON left his residence at approximately 7:00 a.m.,
driving the red TOYOTA pick-up truck.  It was DILLON'S intention
to check out the land at the OHIO POWER COMPANY in Noble County.
DILLON remembers stopping at the DUKE AND DUCHESS RESTAURANT

FD-302a (Rev. 11-15-83)

70A-CI-60437

Continuation of FD-302 of    THOMAS LEE DILLON                    , On    7/2/93    , Page    6

where he purchased beer.  At approximately 9:30 a.m., DILLON
remembers traveling on a roadway in the OHIO POWER recreational
area and observed an unknown white male fishing alone at a pond.
As DILLON drove past, the unknown male waved at him.  DILLON
continued up the road then parked the truck along the side of the
roadway.  DILLON exited the truck with a 6.5 time 55 Swedish
mouser rifle, the same rifle used to kill CLAUDE HAWKINS, and
walked to the other side of the roadway and up a hill into some
pine trees.  DILLON estimated he was approximately 150 feet away
from the unknown male and noticed the individual appeared to have
just finished fishing, turned and started to walk away from the
pond.  At that time, DILLON pulled the trigger and shot the
unknown male in the back.  The unknown male immediately dropped
to the ground.  DILLON pulled the bolt action back and removed
the casing, placed another round into the rifle, chambered the
round, fired another shot at the unknown male while he was laying
prone to the ground.  This time the round appeared to strike the
victim in the backside.  DILLON estimated the time he shot the
victim was approximately 10:30 a.m.  After the shooting, DILLON
returned to his vehicle and departed.  DILLON drove to his
residence in Magnolia, Ohio, and decided to take the gun, along
with some ammunition, to a gun show in Massilon, Ohio, that
afternoon so he could sell the gun and ammunition in order to get
money to purchase an anniversary present for his wife.  DILLON
drove to Massilon, Ohio, where he sold the Swedish mauser rifle
to an unknown male and then purchased a .25 caliber handgun from
the same individual.  DILLON indicated he had to sign an ATF form
when he purchased the handgun.  DILLON estimated the transaction
at the gun show took place at approximately 2:30 p.m.  DILLON
indicated again the 6.5 times 55 Swedish mauser rifle was the
same rifle used to kill HAWKINS and BRADLEY and the ammunition
used in both homicides was from the ammunition he sold to the
unknown male at the gun show.  DILLON remembers the weather on
the day of the BRADLEY homicide as a nice sunny day with
temperatures at approximately 40 to 45 degrees.  DILLON did not
return to the scene of the BRADLEY homicide.  DILLON also
indicated he stopped his subscription to the TIMES LEADER
newspaper about this time because it became too expensive and he
had somewhat lost interest in the PAXTON case.

FD-302a (Rev. 11-15-83)

70A-CI-60437

Continuation of FD-302 of  THOMAS LEE DILLON _____ , On  7/2/93  , Page  7

Besides the five above mentioned homicides DILLON
admitted committing, DILLON related an incident in which he had
attempted to shoot and kill an unknown male on July 24, 1980, in
Tuscarawas County.  DILLON stated he had been hunting groundhogs
with his AR 15 rifle and was returning home late in the evening
when he was driving down a road and noticed a house with a light
on and an unknown male sitting directly in the center of a
picture window.  DILLON stopped his truck, backed it up, got out
and removed the AR 15 rifle from his truck, aimed and fired a
shot at the man who was facing away from the window.  DILLON
indicated the bullet struck the window and appeared to hit the
man.  DILLON then entered his vehicle and departed.  DILLON
learned the next day from reading the newspaper accounts the man
was only wounded and believes because the bullet hit the window
it fragmented and only part of the bullet struck the man.

DILLON denied responsibility in the shooting deaths of
two hunters in Kalamazoo, Michigan on November 17, 1990, as well
as the shooting death of a hunter in Steuben, Indiana, on
November 16, 1991.  DILLON denied involvement in the shooting and
wounding of a woman in Zanesville, Ohio, on March 28, 1992, while
she was picking up cans along a roadway.  DILLON also denied
involvement in the shooting death of a turkey hunter in Meigs
County in May, 1992.  DILLON reiterated he is only responsible
for the five homicides mentioned above and the one attempted
homicide and no others.  DILLON indicated there were no other
close calls or near misses.  DILLON also advised at no time was
he aware he was under investigation by Task Force members nor was
he aware of surveillance conducted on him.

A break was taken by all participants at approximately
11:39 a.m.

At 12:46 p.m., all participants returned and the
interview of THOMAS DILLON was continued:

FD-302a (Rev. 11-15-83)

70A-CI-60437

Continuation of FD-302 of   THOMAS LEE DILLON _____ , On __7/2/93__ , Page ___8___

A signed, written statement was taken from DILLON by
Sheriff LANDON SMITH, detailing the homicides of DONALD WELLING
on April 1, 1989, and KEVIN LORING on November 28, 1990.  The
statements were reviewed by DILLON and signed by him.  The
statements were then witnessed by Captain DANE SHRYOCK and
Special Agent HARRY W. TROMBITAS.

DILLON stated he acted alone in each of the homicides
and that there was no one else present with him at the time the
homicides were committed.  DILLON also advised he told no one he
committed the homicides.  DILLON expressed an interest in reading
books on serial murders and stated he kept copies of the books in
his camper he kept behind his house.  DILLON indicated all maps
detailing the areas of the homicides were found by investigators
during the search of his residence and office.  DILLON again
explained he had thrown the weapon used in the WELLING case as
well as the typewriter used to type the letter to the TIMES
LEADER regarding the PAXTON case into the Sandy Creek River in
Tuscarawas County.  DILLON denied any involvement in the
homicides of two Stark County men in 1980 and 1983.

A break was taken by all participants at approximately
1:24 p.m.

All participants returned to the interview room at 1:25
p.m., and the interview was continued:

DILLON advised there was no need for him to keep a
diary or newspaper articles detailing the homicides as he has a
very good memory.

DILLON stated in general he was responsible for
numerous animal killings, arsons and vandalisms in the
Southeastern Ohio area.  DILLON admitted he had committed 160
arsons which caused, in his estimation, at least 2 million
dollars in damage.  DILLON also admitted shooting approximately
20 cows, usually using a bow and arrow because it was "quieter."

FD-302a (Rev. 11-15-83)

70A-CI-60437

Continuation of FD-302 of   THOMAS LEE DILLON _____ , On ___7/2/93___ , Page ___9___

    In referring back to the arsons, DILLON stated on June 21, 1990, he was able to commit seven arsons in one day and seemed to pride himself on his ability to do so many in one day.  DILLON indicated he used matches or candles when setting the arsons and sometimes used kerosene.  DILLON indicated that the maps investigators found during the searches of his residence and office indicated structures he had either burned or intended to burn.  DILLON estimated he has shot and killed well over 1,000 dogs and cats.

    DILLON promised to review maps of various counties and would mark the maps to indicate the locations of the arsons, animal killings and vandalisms that took place.  DILLON stated this would take several days to accomplish.

    The interview was terminated at approximately 2:12 p.m.

# **APPENDIX N**

KCSD Incident Report

November 18, 1990

# KALAMAZOO COUNTY SHERIFF'S DEPARTMENT
## COMPLAINT REPORT

RECORD'S COPY

COMPLAINT # 90 - 22452

| COMPLAINANT/VICTIM | (LAST-FIRST MIDDLE) | RACE | SEX | DOB | HOME PHONE | BUS PHONE | COMP/VICT PR? |
|---|---|---|---|---|---|---|---|
| Kalamazoo County | | 9 | 3 | | | | ☒ |

| ADDRESS | | BUS/SCHOOL | RES. VENUE | VICTIM/SUSPECT | INJURY | DAM ASS |
|---|---|---|---|---|---|---|
| | | RECORDED | 89 | 9 | RELATION | |

| NATURE OF COMPLAINT | LOCATION OF OCCURANCE (ADDRESS) | CODE # | CRIME SCENE | VENUE |
|---|---|---|---|---|
| ATT HOMICIDE | 16000 EAST X AVE | 0900-1 | TYPE V | 15 |

| REPORTED BY (LAST FIRST, MIDDLE) | RACE | SEX | DOB | HOME PHONE | BUS PHONE | HOW RP'D |
|---|---|---|---|---|---|---|
| LANDRUM DAVID | 1 | 1 | ? | 729-5674 | | 1 |

| DATE OF OCCURANCE | DAY | TIME (MILITARY) | DATE REPORT REC'D | DAY | TIME | PRINTS | TOOL/WEAP | |
|---|---|---|---|---|---|---|---|---|
| 11-17-90 | SAT | 16:30 - 18:15 | 11-17-90 | SAT | 18:18 | PHOTOS O | 12 | $ |

| CODE | NAME (LAST - FIRST - MIDDLE) | RACE | SEX | DOB | ADDRESS | VENUE |
|---|---|---|---|---|---|---|
| V | BENNETT JAMES EDWARD | 1 | 1 | 4-6-53 | 52041 LAWRENCE LEONIDAS | 95 |
| | HOME PHONE 496-7386 | | | CHARGE | ARRESTED BY | EMP. # |

| CODE | NAME (LAST - FIRST - MIDDLE) | RACE | SEX | DOB | ADDRESS | VENUE |
|---|---|---|---|---|---|---|
| V | ESTES DOUGLAS DUANE | 1 | 1 | 9-15-57 | 417 BARTON | |
| | HOME PHONE UNK | | | CHARGE | ARRESTED BY | EMP. # |

| CODE | NAME (LAST - FIRST - MIDDLE) | RACE | SEX | DOB | ADDRESS | VENUE |
|---|---|---|---|---|---|---|
| W | PERRY MARK RANDALL | 1 | 1 | 11-13-59 | 5478 MARKET | 05 |
| | HOME PHONE 344-8962 | | | CHARGE | ARRESTED BY | EMP. # |

| VEH ICLE | COMPL. ☐ | YEAR | MAKE | MODEL NAME | BODY STYLE | COLOR | BODY DAM ☐ CODE | AUTO INSURANCE CO |
|---|---|---|---|---|---|---|---|---|
| | SUSP. ☐ | | | | | RUST | | |

| VIN | | LICENSE # | STATE YEAR | KEY IN VEH | INVENTORY | WRECKER USED |
|---|---|---|---|---|---|---|

| LOCATION OF RECOVERY | DATE OF RECOVERY | TIME | BY WHOM RECOVERED | EMP. # | VENUE |
|---|---|---|---|---|---|

| ALARM TYPE | | ACTUAL | HUMAN ERROR | PHONE LINE FAILURE | EQUIP MALF. | STORM | UNK. | FOLLOW UP DEP ASSIGNED | EMP. # |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Diersema 11-18-90 | |

DETAILS OF INVESTIGATION

ATTEST: A TRUE COPY

Kalamazoo County Sheriff Dept.
KALAMAZOO, MICHIGAN

By Barbara Palumbo 1312

| | INVESTIGATING DEP (S) R. RICHARDS | EMP # 6961 | | 20 W. GREENFIELD | | EMP # 516 | SECTOR 312 |
|---|---|---|---|---|---|---|---|

| EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | TOTAL EST VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | | $ | | $ | | $ | | $ | | $ | | $ | | $ |

| PK ST | PURSE SNATCH | SHOP LIFT | FROM BLDG | MV PARTS | FROM MV | BICY | FROM COIN MACHINE | OTHER | CASE CLOSED BY | DATE | CONNECTING CASE(S) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | STOLEN LOCAL | OTHER | TYPE: AUTO | BUS/ TRUCK | OTHER | RECOVERED LOCAL | OTHER | | UNFOUNDED CLEARED EXCEPTIONAL | IF ACTIVE (NOT CLEARED) CLEARED BY ARREST | PROPERTY RECOVERY |

FORM DATA 9 (1-81)

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION

**REPORTING PERSON:**

DAVID LANDOUM, W/M, DOB: unknown, ADD: unknown, tx 729-5874. The initial call was called in by this individual.

**VICTIMS:**

1) JAMES EDWARD BENNETT, W/M, DOB: 4/6/53, ADD: 52041 Lawrence Street, Leonidas, Michigan, tx 496-7386. Physical: 5'9", 165#, bro/bro, mustache. MICHOPS: B-530-367-189-270. SSN 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. Wearing blue jeans, what appeared to be a camouflaged jacket with a very faded orange hunter's vest, and an orange stocking cap, which was laying next to him. There was also a black powder gun, which is believed to have been the victim's, and which he was going to use for hunting.

2) DOUGLAS DUANE ESTES, W/M, DOB: 9/15/57, ADD: 417 Barton, Kalamazoo, tx unknown. Physical: Approximately 6'4", 295#, bro/grn, unknown facial hair. Wearing carharts with an orange hunter's vest, and is believed he had additional clothing on underneath...his blue jeans could be seen coming underneath the carharts.

**WITNESSES:**

1) MARK RANDALL PERRY, W/M, DOB: 11/13/59, ADD: 5478 Market Street, tx 344-8962. Employed by J. Molloa & Sons, Grand Rapids.

Witness advised that at approximately 2:30-3:00PM, the victim DOUG ESTES, his stepson, BOBBY BROWN, and he went to the State Game area on East "X" Avenue, east of 44th Street, to go deer hunting. As they parked their vehicle in the parking area, they walked back through the field and as they were just about up to the wooded area, PERRY stated he cut to the west going across the field approximately 100-150 yards into the wooded area. He stated that BOBBY BROWN and DOUG ESTES continued south into the wooded area.

Stated that approximately one hour to an hour and a half later, he heard two shots. The shots being one right after the other. He stated that it sounded like a 12-gauge as it was extremely loud. Right after that he heard someone yell, however, advised that it did not appear to be a panic yell. He said he could not understand exactly what was being said.

Stated about an hour to an hour and a half after that, BOBBY started yelling his name. Stated that the only thing BOBBY yelled was his name. He went running to the edge of the field and when he came out, BOBBY was white in appearance, and said that DOUG and another guy had been shot. PERRY then asked BOBBY if DOUG was breathing and BOBBY stated he did not know. BOBBY led him back to the area where the victims were, and upon arriving, he immediately went over to ESTES. Stated that ESTES was laying facedown with his head underneath a log. Stated he pulled ESTES out from underneath the log, rolled him over and checked his neck area attempting to locate a pulse, however, was unable to do so.

| EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | TOTAL EST VALUE | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | | $ | | $ | | $ | $ | | | | PARTIAL |
| | | | EMP # | CASE CLOSED BY | | | DATE | CLEARED EXCEPTIONAL | CLEARED BY ARREST | | NONE |

KALAMAZOO COUNTY
SHERIFF'S DEPARTMENT **UPPLEMENTAL REPOR**

APP TICKET #

| | FILE CLASS | COMPLAINT # |
|---|---|---|
| | 1.1 | 90-22452 |

FORM DATA 9 (1-81)

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | | RACE | SEX | ADDRESS |
|---|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION:

PAGE 2

PERRY stated he did not go over to the other individual or check the other individual and told BOBBY to stay there and he would go get help. He immediately started running northbound through the woods into the field yelling for help. He stated he ran across a man and his wife, advising them that someone had been shot and requested assistance. The wife went to a telephone to call for assistance and the gentleman then returned with him, PERRY, to the scene.

Upon arriving back at the scene, BOBBY stated he had to go call his mother and took off running. He said that the man who was with him asked him if his gun was loaded. He stated it was. The man then asked him to unload his gun, at which time, PERRY did unload his gun and handed it to the unknown man at his request. The man then set the gun against the tree and waited until the arrival of the police.

PERRY also stated that about a half hour after the shots, he saw a man leaving the general area, however, the man was just walking. Stated that the man was shorter than DOUG and that his coat was solid orange in color. It is unknown if this information has any bearing on the case or not.

. . .See attached written statement from MARK PERRY.

**2) MELVIN FRANK HARVEY**, W/M, DOB: 8/4/38, ADD: 16460 East "X" Avenue, tx 729-9693. Employed at General Foods at Post in Battle Creek.

Witness stated that on 11/17/90 at approximately 6:30PM, his son had just left his house as he had been hunting and was headed home. He stated that his son, after just leaving, returned immediately saying that two individuals had been shot. However, it was his belief that they were only wounded from information he had received.

He stated he waited for a few minutes and then went down to the area near the entrance on "X" Avenue. Stated that there were several subjects standing around, however, there was a young W/M standing by a truck crying. He stated that the young W/M standing by the truck was by himself. He went up and asked if there was anything he could do...eventually finding out that the individual was a BOBBY BROWN. BOBBY stated that he would like to make a phone call and tell his mother what happened. Mr. HARVEY stated he transported BOBBY to his residence where BOBBY attempted a couple of calls, however, it appeared as though he was unsuccessful in contacting his mother as he told an individual on the other end of the phone to tell his mother that DOUG was dead and another guy he didn't know had also been shot.

HARVEY advised that BOBBY told him his stepfather was laying under a log and that he pulled him out and checked his pulse. BOBBY said he checked the other guy and that both subjects were dead. BOBBY continued advising that the unknown deceased victim had a hole all the way through his chest. He said he rolled the guy over to check him. He also said that it looked like someone had gone through the wallets because there were papers scattered all about the immediate area. He also said that his dad's gun was missing and that the other guy had a muzzle loader. BOBBY had also told Mr. HARVEY that he had found a name on a piece of paper or something that he thought was the unknown deceased person's name.

| PROP-ERTY | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | TOTAL EST VALUE | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | |
| INVESTIGATING DEP | | | | | EMP # | | CASE CLOSED BY | | , DATE | CLEARED EXCEPTIONAL | CLEARED BY ARREST | PARTIAL / NONE |

**KALAMAZOO COUNTY**
**SHERIFF'S DEPARTMENT**     **UPPLEMENTAL REPO.**

| APP TICKET # | |
|---|---|
| FILE CLASS COMPLAINT # | |
| 1.1 | 90-22452 |

| FORM DATA 9 (1-81) | | | | |
|---|---|---|---|---|
| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION:

PAGE 3

BOBBY told HARVEY that he was way beyond the area where he had found the bodies while he was hunting. He also stated that when he found the bodies, they were warm. Mr. HARVEY had no further information to offer.

3) ROBERT CHARLES BURGETT, W/M, DOB: 1/23/61, ADD: 133½ East Mill Road, Athens, tx 729-9164. Employed by Spencer Ambulance Service and was driving by the scene just shortly after it had happened when he was waved over. No statements were taken at this time from this witness.

4) JAMES LEON SPOOR, W/M, DOB: 8/15/42, ADD: 310 S. Capital Avenue, Athens, tx 729-4100. Employed by Spencer Ambulance Service and was riding in the same vehicle as Mr. BURGETT. Unknown what information he had to supply. He was released at the present time and advised he would be contacted later.

5) DAVID EARL LANDRUM, W/M, DOB: 9/7/41, ADD: 13884 White Lawn, Fulton, tx 778-3394. Volunteer fireman for Wakeshma Fire Department. He was not dispatched to the scene, however, stopped to help when the ambulance went by. Unknown what information this individual has to offer.

6) RONALD WAYNE ELWELL, W/M, DOB: 7/20/60, ADD: 16060 East "X" Avenue, tx 729-5523. This witness lives in the residence across the street from the area of the State Game area and once he was aware of the incident, had his wife call the emergency services. It is unknown what other information this individual has as an interview was not conducted with him at the time.

7) CLARENCE JOYCE JONES, W/M, DOB: 6/3/40, ADD: R#1, "X" Avenue, Fulton, tx 729-4789. This witness was present at the scene upon our arrival and was back in the area where the homicide occurred. It is unknown what information this individual has.

8) KIMBER TRACEY, W/F, DOB: 5/10/60, ADD: 52041 Lawrence Street, Leonidas, tx 496-7386. Girlfriend of the deceased, JAMES BENNETT, living in a spousal relationship.

This witness was contacted by R/O and advised of the incident. She was then transported to a friend's house, being STEVEN RYAN. KIMBER advised that JIM BENNETT had left his residence at 4:30PM on 11/17/90 for purposes of going hunting, going to the State Game area. She further advised that he was not going with anyone and that he was by himself at the time. It was asked of her if the time period could have been alittle bit before or alittle after, she stated no, because both her and her daughter had checked and it was, infact, 4:30PM when JIM BENNETT left the residence. This witness was extremely hysterical and should be contacted for additional information.

9) SHERRY BENNETT, W/F, approximately 31 years of age, living somewhere in the general area of the 5200 block of Fulton Road, located in Leonidas, unknown tx. This individual pulled into the residence of STEVEN RYAN and immediately became hysterical prior to finding out exactly what information was available in regards to her brother. She is the sister of the deceased JAMES BENNETT. Information was relayed to her in regards to the incident and it was requested that she make contact with her parents, being her mother and her brother, who currently resides somewhere in Pontiac. Information from her after requesting that would be that it was the family's request that the body eventually be released to Schipper's Funeral Home located in Colon, Michigan. This apparently was decided upon by the mother of the deceased.

| PROP-ERTY | CLASS | EST VALUE | CLASS | EST. VALUE | CLASS | EST VALUE | CLASS | EST. VALUE | TOTAL EST. VALUE | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | | PARTIAL |
| INVESTIGATING DEP | | | | | EMP # | CASE CLOSED BY | | | DATE | CLEARED EXCEPTIONAL | CLEARED BY ARREST | | NONE |

KALAMAZOO COUNTY
SHERIFF'S DEPARTMENT
**SUPPLEMENTAL REPORT**

APP TICKET #
FILE CLASS | COMPLAINT #
1.1 | 90-22452

| FORM DATA 9 (1-81) | | | | | |
|---|---|---|---|---|---|
| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS | |
| NATURE OF COMPLAINT ATT | DATE OF OCCURANCE | | | ADDRESS OF OCCURANCE | |

DETAILS OF INVESTIGATION:

PAGE 4

10) **STEVEN MICHAEL RYAN**, W/M, DOB: 4/6/61, ADD: 52628 Fulton Road, tx 496-8078. Employed at the Federal Center, Battle Creek.

Information was relayed to me by both KIMBER TRACEY and SHERRY BENNETT that STEVEN, who had agreed to do so, accompany me to KCSD County Morgue for purposes of positive identification of the body. KIMBER TRACEY had refused totally and SHERRY BENNETT stated she was unsure if she could do it, therefore, STEVEN RYAN did, infact, accompany me and did make positive identification of JAMES BENNETT, being an extremely close friend of his.

11) **STANLEY WAYNE DRISKELL**, W/M, DOB: 5/29/36, ADD: 4830 Washtenaw Avenue, Apt #C-2, Ann Arbor, tx 313/434-8257.

This witness was a passenger driven by the upcoming witness. They were travelling westbound through an open field on land that the next witness stated belonged to him.

12) **JEFF EDWARD TITUS**, W/M, DOB: 2/15/52, ADD: 15388 S. 46th Street, Fulton, tx 729-9293. This individual stated he is the owner of the property adjacent to the State Game area, east/southeast section and the easterly section of the land connected to the state line just east of the crime scene area.

Witness was driving a 1984 Ford pickup truck, bearing Michigan registration CR-2939. The vehicle appeared to be dark in color, however, due to the poor lighting and the truck being extremely dirty, it was hard to tell for sure what color it was...whether or not it was gray or possibly blue.

TITUS and DRISKELL stated that they were just coming up to the area to check some traps, which had been set on their property. They had no further information to offer, however, did inquire as to what was going on. Only enough information to appease them was given, nothing further pertaining to the case. They were requested to not let anybody on their land as the area was going to be cordoned off and that they not come back into this particular area until after the investigation was over. Mr. TITUS stated that it was very understandable and offered assistance in regards to the police, fire department or whatever, could use his property for purposes of driving back to the crime scene area.

## INVESTIGATION:

On the above date and time we were dispatched to the 1600 block of East "X" Avenue in regards to a possible double homicide. We arrived within seconds after Deputy OTTE arrived. Deputy OTTE being temporarily assigned to the Village of Climax.

Upon arrival, I made contact with some individuals who stated that there were two bodies that had been located that were laying out in a wooded area, being approximately 1/2 mile or so off from the road. They stated it could not be driven back and officers would have to walk back. I asked them if they would take me to the area and upon looking at a particular area, it was determined that I could bypass the barricaded area where some large rocks were and get around some trees being able to drive back to the area. Thus, attempting to save some time so a quick determination could be made.

| PROP-ERTY | CLASS | EST. VALUE | CLASS | EST. VALUE | CLASS | EST. VALUE | CLASS | EST. VALUE | TOTAL EST. VALUE | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | | PARTIAL |
| INVESTIGATING DEP | | | | | EMP # | | CASE CLOSED BY | | DATE | CLEARED EXCEPTIONAL | CLEARED BY ARREST | | NONE |

**KALAMAZOO COUNTY**
**SHERIFF'S DEPARTMENT**　　　　　　**SUPPLEMENTAL REPORT**

| | | APP TICKET # |
|---|---|---|
| | FILED AS COMPLAINT # | |
| 1.1 | 9C-22452 | |

| FORM DATA 9 (1-81) | | | | |
|---|---|---|---|---|
| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
| NATURE OF COMPLAINT | DATE OF OCCURANCE | | ADDRESS OF OCCURANCE | |
| ATT | | | | |

DETAILS OF INVESTIGATION

PAGE 5

Upon driving back within a short distance of the actual crime scene, we made it back to the immediate area. Upon walking in the area, there were two bodies lying on the ground. One body to the west, being the larger individual, later identified as DOUGLAS ESTES, was laying on his back with a considerable amount of blood in his facial area. This subject was dressed in carharts and did have on hunter's orange.

A second individual off to the left side was also laying on his back. There were several business card type pieces of paper and smaller pieces of miscellaneous papers scattered about the area just to the south and east of his body. Just to the west of his body, a very short distance from his feet, was a black powdered style muzzle loading rifle. There was an obvious wound to the chest as there was an extremely large amount of blood coming from the chest area, having that particular portion of clothing soaked.

I inquired of a couple of individuals who were there if the area had been protected or if any other persons had been in the immediate area of where the bodies had been located. I was advised that there had been at least six additional people compared to the people already being there at the scene, being a total of four civilians, along with myself, Deputy OTTE and Reserve Officer GREENFIELD. It was requested that everyone stand back from the area and a check of the immediate area did not turn up any additional guns.

There was one older style looking pump shotgun leaning against a tree. First, I thought this to be the weapon of one of the victims, however, I was advised that that particular weapon belonged to an individual who was over sitting on a fallen tree and appeared to be very shaken. That individual was later identified as MARK PERRY.

As I attempted to talk to some of the individuals, it was extremely obvious that MARK PERRY was very upset and had a hard time maintaining his balance when he got up. I requested him to accompany to my car where he could sit down and the car being considerably warmer as it was very cool on this particular evening. I took possession of his shotgun and advised him that the shotgun was going to be temporarily confiscated until the entire investigation was over. He agreed, stating he had no problems with that.

Once MARK PERRY was taken to the car, a statement was obtained and eventually, MARK was taken back out to the roadway where he was released.

While the fire department had arrived on the scene bringing portable lighting for purposes of attempting to light of the crime scene area, there was a vehicle spotted travelling westbound through a field immediately adjacent to the east side of the crime scene area. R/O along with Reserve Officer GREENFIELD and another Reserve Officer went over to attempt to find out some identification and what these individuals were up to. Both individuals complied with every request, showing appropriate identification, stating that one of the individuals, being TITUS, stating he owned the land in question and further advised that he owned some additional trees and was considering doing some logging.

It was immediately relayed to radio that the situation did appear to be a double homicide and additional units were requested. Sgt KEELAN responded along with Deputy THOMAS SHARP, Deputy THOMAS HARMSEN, Captain JAMES VANDYKEN. The C.I.D. was notified and responded. D/Sgt WIERSEMA was notified and responded. Deputy OTTE was already on the scene, and Sgt JOHNSON was also summoned to respond.

| PROP-ERTY | CLASS | EST. VALUE $ | CLASS | EST. VALUE $ | CLASS | EST. VALUE $ | CLASS | EST. VALUE $ | TOTAL EST. VALUE $ | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INVESTIGATING DEP | | | | EMP # | | CASE CLOSED BY | | | DATE | CLEARED EXCEPTIONAL | CLEARED BY ARREST | PARTIAL | NONE |

**KALAMAZOO COUNTY**
**SHERIFF'S DEPARTMENT**   **UPPLEMENTAL REPO**

| APP TICKET # | | |
|---|---|---|
| FILE CLASS | COMPLAINT # | |
| 1.1 | 90-22452 | |

| FORM DATA 9 (1-81) | | | | |
|---|---|---|---|---|
| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION:

PAGE 6

The M.E. was notified, who also responded to the scene. There were two DNR officers who responded along with fire personnel and the earlier-mentioned persons from Spencer Ambulance, who stoodby and eventually made transport of the deceased bodies to the Kalamazoo County Morgue.

Prior to myself clearing, I was advised of an address in Leonidas to go to to attempt to make contact with any family. Once I cleared and went to the residence, I made contact with a female identified as KIMBER TRACEY. Upon making contact with her, I asked if R/O and Reserve Officer GREENFIELD could come in in reference to speaking to her. She refused to allow us into the residence, stating that she was alone and was not going to allow any men into the trailer. I advised her that myself, being fully dressed as a police officer along with Reserve Officer GREENFIELD, driving a fully-marked police cruiser and I could show her appropriate identification, again requesting permission to come in and speak to her in regards to a very important and serious manner. Again, she refused our admittance inside.

I then inquired to make sure that the address was appropriate as there were no markings. She stated that this was. I asked her if JAMES BENNETT lived there and she stated that he did, but he was not home at the present time. I advised her that there had been an accident. She inquired if he had been injured. I advised her that he had and again requested permission to enter. She held the door so that I could not see into the trailer and again she continuously refused us admittance to the trailer to sit down and talk with her. I requested information from her regarding to any other family members who could come over and be present, however, she stated that there was one sister who lived a short distance away, however, she had no telephone. She then inquired as to whether or not JIM BENNETT was dead or had been killed and at this point I advised her that he had. I then again requested permission to come in and again permission was denied. I asked her if I could at least get directions to the sister's house so that I could make contact there. She advised me that she would wake her daughter up and that she would accompany myself and Reserve Officer GREENFIELD to JIM's sister's. She immediately closed the door and after a very short time, she and her daughter both reappeared at the door. They appeared at the door and immediately closed it and at this time I transported them to the sister's house to attempt to make contact, however no one was home at the residence.

We then drove into Leonidas to the local bar to attempt to locate the sister. Her vehicle could not be located. She requested permission to go inside to see if she could find someone who knew JIM as I had requested her to make identification of the body and she stated that she would not do so. Upon going into the bar, there was an individual she immediately picked out...being STEVE RYAN. I asked him to please come outside as I wished to speak to him. He did comply with my request and I advised him that BENNETT had been killed and was requesting his assistance in identifying the body. He stated he would. I then followed STEVE RYAN to his residence where he parked his vehicle.

KIMBER TRACEY and her daughter went into RYAN's residence to stay with RYAN's wife and just as we were getting ready to leave, a truck pulled in to RYAN's driveway. The driver of the truck, later being identified as JAMES BENNETT's sister, SHERRY. She was advised of the information and requested to go inside and have a seat, which she was helped inside so that she could have seat.

We then cleared, returning to KCSD. Once the body was cleaned up by R/O, Mr. RYAN was brought in for purposes of identification. He immediately identified JAMES BENNETT as being the deceased person and then was taken back out.

| PROP-ERTY | CLASS | EST. VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | TOTAL EST. VALUE | | UNFOUNDED | | INACTIVE (NOT CLEARED) | | PROPERTY RECOVERY | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | | | | | PARTIAL |
| INVESTIGATING DEP | | | | | EMP # | | CASE CLOSED BY | | | DATE | CLEARED EXCEPTIONAL | | CLEARED BY ARREST | | | NONE |

APP TICKET #

FORM DATA 9 (1-81)

| COMPLAINANT/VICTIM | (NAME - LAST - FIRST - MIDDLE) | RACE | SEX | ADDRESS |
|---|---|---|---|---|

| NATURE OF COMPLAINT | DATE OF OCCURANCE | ADDRESS OF OCCURANCE |
|---|---|---|
| ATT | | |

DETAILS OF INVESTIGATION:

PAGE 7

I then made contact with Sgt KEELAN and advised him of the earlier results.

Request was made that some additional equipment be taken to Deputy SHARP as long as I was transporting Mr. RYAN back to Leonidas. Mr. RYAN was transported back to Leonidas and once the information was confirmed without doubt that JAMES BENNETT was the individual who was deceased, it was requested again of SHERRY BENNETT that she make contact with her mother and brother, who apparently live in Pontiac. She did make contact via tx. I did answer some questions for them over the telephone and they did request that Schippers Funeral Home take care of the body after the post.

After consoling the persons present at the residence and talking further, trying to obtain any additional information, only information that was obtained was that the name DOUGLAS ESTES did not sound familiar to any of the subjects.

I eventually cleared, transporting additional equipment to Deputy SHARP and then returning to KCSD where the additional arrangements had been taken care of by R/O in the morgue. The weapon which I had confiscated from MARK PERRY was placed into Evidence under Tag #8883...being a Stevens Model 77B, 12-gauge pump-style shotgun. No serial number was located.

All appropriate forms were filled out and I was then instructed by Sgt FREVER to return to the crime scene to assist Deputy SHARP.

Respectfully,

DEPUTY RUSS RICHARDS
R.O. WADE GREENFIELD

/gc
11/18/90

| PROP-ERTY | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST VALUE | CLASS | EST. VALUE | TOTAL EST. VALUE | UNFOUNDED | INACTIVE (NOT CLEARED) | PROPERTY RECOVERY ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | | $ | | $ | | $ | $ | | | PARTIAL |
| INVESTIGATING DEP. RICHARDS | | | | EMP # 6911 | | CASE CLOSED BY | | DATE | | CLEARED EXCEPTIONAL | CLEARED BY ARREST | NONE |

# __APPENDIX O__

Helen Nofz Affidavit

June 9, 2021

JILL A. CASE
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF CALHOUN
My Commission Expires Aug. 12, 2022
Acting in the County of _Calhoun_

**Affidavit of Helen Nofz**

**BEFORE ME**, the undersigned Notary, _____Jill A Case_____, on this 9th day of _June_, 2021 personally appeared Helen Nofz, who being by me first duly sworn, on her oath, deposes and says:

1. My name is Helen Nofz, and I make this affidavit from personal knowledge of the matters addressed herein.

2. In November 1990, I was living at 15962 Y Avenue, Fulton, Michigan.

3. On November 17, 1990, a neighbor called me at approximately 5 p.m. and asked for assistance with a car that had driven into a ditch at Y Avenue and 46th Street. I agreed to drive down there with my nine-year-old son, Derek, to offer assistance.

4. Police detectives visited my home and interviewed me about the day of the double homicide. I told police the vehicle I saw in the ditch on November 17 was a small two-door, hatchback-style car, with a broken right rear rail light covered with duct tape. The tail light did not wrap around the side of the vehicle. I could not determine the exact make of the vehicle but believed it was probably a 1985 model or a little newer.

5. When asked about the driver in the ditch, I described the individual as a stocky white male, approximately 5'10" to 5'11", approximately 30 years of age, who wore wire-rimmed glasses. He was wearing some sort of camouflage clothing and a blaze orange knit cap with a brown fold area at the bottom.

6. I told the man that I could go home and call the police to get a wrecker and that the police could help him file a report for his insurance. He said that he didn't need the police because his brother-in-law could fix the car and he only needed help pulling the car out of the ditch. The man was sweating profusely and seemed nervous.

7. The man stated that a deer had run in front of him. But I had never seen any deer cross specifically at that intersection and thought it was odd that the vehicle would have ended up in a ditch at that location due to a deer crossing.

8. I got in my car and left the intersection after another man in a black truck pulled up to the intersection and offered to help the stuck driver.

9. Police investigators asked if I would assist with a composite sketch of the individual or identify the vehicle from a vehicle identification booklet if one was given to me. I stated that I would.

10. Police drew a composite sketch of the driver based on the description I provided. When the sketch was completed, I stated that everything looked pretty much exact, except that the man's cheek bone area was a little wider. I was asked to extend the thickness of the face of that area with a grease marking pencil, which I did. At that point, I stated that the composite looked at least 90 percent to the likeness of the individual I believed I saw.

11. I also looked through the motor vehicle identification booklet. I picked out a 1987 Dodge Shadow, which looked very similar to the car I saw in the ditch. However, I thought the windows sloped a little more and the car in the ditch had a shorter trunk section. The tail light also did not wrap around the side, as shown in the photograph.

12. After the murders, I was interviewed separately by Det. Bruce Wiersema with the Kalamazoo Co. Sheriff's Department. My son, Derek, was also interviewed. We told Det. Wiersema that we saw an individual stuck in a ditch at approximately 5 p.m. on November 17, 1990, one half mile from where Doug Estes and Jim Bennett were killed.

13. In February 1993, Det. Wiersema arranged for a line-up to occur at the Coshocton Co. Sheriff's Department in Ohio. Det. Wiersema accompanied myself and Derek to the department. We picked the man we believed was the driver stuck in the ditch on November 17, 1990.

FURTHER, YOUR AFFIANT SAYETH NOT.

[Signature of Affiant]

HELEN E. NOFZ

[Print name]

6-9-2021

[Date]

# **APPENDIX P**

Mike Chappell Affidavit

June 17, 2021

## AFFIDAVIT OF MIKE CHAPPELL

**BEFORE ME**, the undersigned Notary, personally appeared Mike Chappell, who being

by me first duly sworn, on his oath, deposes and says:

1. My name is Mike Chappell. I currently live in the Cleveland, Ohio area.

2. In 1993 I was in the Lake County Jail in Painesville, Ohio for a marijuana offense. While I was there, I met Thomas Dillon.

3. Tom would come to my cell during the day to play chess and talk. He told me he was in jail for killing people.

4. I asked him how he started killing people, and he said when he was a kid he would go to the dump and shoot at rats, and then he started shooting at cats and cows. Tom said, "where do you go after that? People."

5. Tom told me about his "double header" murder, and he seemed really proud of it. Tom said he was walking through the woods and he saw two guys standing close together. Tom said he yelled hello to them and when they looked at him to respond, he shot them both. He told me this was his only "double header."

6. Tom told me he was able to fill out his own time sheet at work and get away for hours, and nobody would know where he was. He said that he would burn down a lot of barns during this time.

7. After I met Tom, I was moved to the Federal Correctional Institution, Milan. While I was there, within a few months of meeting Tom, some people from the FBI came to see me. I told them about my conversation with Tom about his "double header" murder.

8. My sentence was not reduced, nor was I promised any other benefit based on this conversation with the FBI.

9. In October 2020, I spoke to a journalist named Susan Simpson, who showed me the attached composite sketch of a man. This man looked very much like Thomas Dillon.

Dated: _6-17-21_

Mike Chappell

Subscribed and sworn to before me on _Jun 17th 2021_ in _Lake_ County, Ohio.

My commission expires: _Jun 30, 2025_

Signature: _Erinne Irena Lombardo_ Notary Public, State of Ohio, County of

## AFFIDAVIT OF JEFF TITUS

**BEFORE ME**, the undersigned Notary, personally appeared Jeff Titus, who being by me

first duly sworn, on his oath, deposes and says:

1. In 2002, I was convicted for the 1990 murders of Doug Estes and Jim Bennett in the Fulton Game Area.

2. At my trial in 2002, I was represented by Charles Fette and Ward McDonough.

3. At no point during or before my trial did I ever hear anyone mention the name "Thomas Dillon."

4. Until 2020, I never heard that a man named Thomas Dillon had been convicted in Ohio of killing numerous hunters and outdoorsmen.

5. I did not learn until 2020 that Helen Nofz and her son had identified Thomas Dillon in a live lineup in 1993 as the man who had driven into a ditch near the Fulton Game Area shortly after Mr. Estes and Mr. Bennett had been killed on November 17, 1990.

6. Until 2020, I never heard from my attorneys, the police, the prosecutors, or anyone else that any of the witnesses who had seen the man in the ditch had identified him.

7. If I had known that witnesses had identified Thomas Dillon, a convicted serial killer of hunters and outdoorsmen, as the man who had driven into a ditch near the Fulton Game Area shortly after Mr. Estes and Mr. Bennett were murdered, I certainly would have asked my attorneys to present evidence about Dillon's identification at my trial.

Jeff Titus

Dated: _7-13-21_

Subscribed and sworn to before me on _7/13/2021_, in _Branch_ County, Michigan.

My commission expires: _8/3/2025_

Signature: _____ Notary Public, State of Michigan

KEVIN DIRSCHELL
NOTARY PUBLIC, STATE OF MI
COUNTY OF BRANCH
MY COMMISSION EXPIRES Aug 3, 2025
ACTING IN COUNTY OF _Branch_

# **APPENDIX R**

*Estes v. Titus* Trial Transcript (Excerpt)

May 26, 2004

A    Correct.

Q    Do you recall indicating during your testimony that you really

     don't have any specific recollection as to what farm you

     hunted at on November 17th of 19990?

A    Correct.

Q    That's correct, is it?

A    Yes.

Q    All right.  That you don't remember going to the blinds that

     afternoon—just on the 17th of November, 1990?  You don't have

     any specific recollection of that either, do you?

A    Thirteen years ago?  I've done it dozens of times.  No.

Q    In fact, you testified—Did you not?—that you have no

     recollection of the times that you and Mr. Titus met that

     afternoon; did you not?

A    Met that afternoon?

Q    Yeah.

A    You mean that evening after—after we'd been to the blinds?

Q    Any—Anytime in the afternoon.

A    Well, that wasn't afternoon; that was evening.

Q    Pardon?

A    That was not afternoon; that was—It's ten to—ten to 6:00.

     Yeah, I know that that's when we met because we were at the

     Burger King at 6:44; and I know how long it takes to get

163

there, and I know about how long it takes to eat.

Q    All right.  The only thing—the only time that you're sure of
     is that you made a telephone call to your home, apparently, at
     6:44; is that correct?

A    That is correct.

Q    You can't sit here and tell the judge—tell the judge that you
     specifically recall meeting Mr. Titus walking back from your
     blind at 5:47, can you?

A    No.

Q    It could have been 6:00 o'clock?

A    Yes.

Q    In other words, you didn't have any stopwatches on; and even
     if—even if you did and watching your time, you don't recall
     what time you met him on November 17th, do you?

A    Not to the minute, no.  I know when I did meet him, however.

Q    Well, you don't even remember what farm you were at, do you?

A    Please move on.

Q    Pardon?

A    Will you please move on.  I've answered the best I can.

Q    That's correct, though, isn't it?  You don't remember what
     farm you were at that afternoon, do you?

A    Who would after 13 years?

               MR. POMEROY:    . . . (inaudible) I'll object in that

                                    164